**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Frank CITRO, Defendant–Appellant.**

**No. 87–1249.**

United States Court of Appeals,
Ninth Circuit.

Submission Deferred Feb. 9, 1988.

Argued and Submitted March 1, 1988.

Decided March 28, 1988.

Robert W. Lueck, Las Vegas, Nev., for defendant-appellant.

Paul E. Wommer, Asst. U.S. Atty., Las Vegas, Nev., for plaintiff-appellee.

Before FARRIS, BRUNETTI and THOMPSON, Circuit Judges.

FARRIS, Circuit Judge:

Visa International, Mastercard International, and Bank of America's Office of Corporate Security discovered an inordinate amount of counterfeit credit card use in the Las Vegas area and worked out an agreement with the Las Vegas Metropolitan Police Department to investigate local merchants for possible collusion in a counterfeit credit card scheme. The police department hired Michael Milano to act as a liaison in introducing undercover officers to merchants willing to accept counterfeit cards. Milano had a prior conviction for operating a counterfeit credit card scheme, but was working as a police informant.

Milano began frequenting a particular lounge where he met the defendant, Frank Citro, and the two became good friends. Milano eventually raised the idea of a scheme involving counterfeit credit cards and collusive merchants and explained to Citro how the credit card scheme might operate. There was evidence at trial that Citro suggested he might know of some merchants who would be willing to accept counterfeit credit cards. Milano told Citro that he had a partner, "Troy Hill" (who was in reality undercover police officer Edward Schaub), who actually possessed the counterfeit cards.

Milano arranged a dinner meeting at an expensive restaurant between himself, Citro, and Schaub, who was posing as Hill. During the dinner, Schaub described to Citro how the counterfeit credit card scheme could work with collusive merchants. Schaub told Citro that he was going to use a counterfeit card to pay for dinner, but Citro was not present at the table when Schaub used the card.

About a week later Milano and Schaub hosted Citro and their respective dates at another expensive restaurant. When the bill came, Schaub told the party that he was posing as Vernon Brown for the night and paid for the dinner using a counterfeit card bearing that name. Schaub testified that after dinner he met privately with Citro who agreed to introduce him to some possible collusive merchants. Schaub also testified that during this conversation, he agreed to pay Citro $200 for each introduction plus a percentage of the purchased merchandise.

A few days later, Citro called Milano and said he had a clothing store lined up to take the credit cards. Citro, Milano, and Schaub met outside the store. Citro patted down Schaub to check for a wire. Schaub explained that he wanted to do a cash deal with the merchant pursuant to which Schaub and the merchant would split fifty/fifty the amount of money charged to a counterfeit credit card. Citro went into the store and spoke briefly with the owners. Citro came out and told Schaub and Milano that the merchant would not do a "cash deal," but that he would accept the counterfeit cards for the purchase of merchandise. The three men all selected suits, and Schaub paid for them using counterfeit cards.

After a few days, Citro called Milano and said that Milano and Schaub should meet him at a jewelry store. When Schaub arrived, Milano was waiting outside, but Citro was inside talking to the owner. Citro came outside and again patted down Schaub. Citro told Schaub that the owner was willing to do a cash deal and that he had negotiated a two-thirds/one-third split between Schaub and the merchant in favor

of Schaub. This was better than the fifty/fifty split Schaub had previously requested. Schaub handed the owner two white plastic cards with only names and numbers embossed on them. The owner processed them as legitimate cards: one for $793.13, and the other for $800.00. After the cards were processed the owner gave Schaub $550 in cash and eighty ounces of silver (worth approximately $260). Once outside the store, Citro accepted $200 from Schaub.

A jury found Citro guilty of conspiracy to use counterfeit access devices in violation of 18 U.S.C. § 1029(b) and attempt to use counterfeit access devices in violation of 18 U.S.C. § 1029(a)(1), (b)(1), and (c)(2). Citro appeals the trial court's denial of his pretrial motion to dismiss based on outrageous government conduct. Citro also appeals the denial of his motions to acquit, as well as his motion for a new trial based on the defense of entrapment as a matter of law. Finally, Citro appeals the trial court's imposition of sentence as an abuse of discretion.

## I.  *Entrapment*

■ In reviewing the denial of a motion for acquittal based on entrapment as a matter of law, the court must view the evidence in the light most favorable to the government, and decide whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Hsieh Hui Mei Chen*, 754 F.2d 817, 821 (9th Cir. 1985), *cert. denied*, 471 U.S. 1139, 105 S.Ct. 2684, 86 L.Ed.2d 701 (1985).

Abuse of discretion is the standard of review governing Citro's appeal of the denial of his motion for a new trial based on the same grounds. *Id.* The court will only grant the motion in exceptional circumstances where the evidence weighs heavily against the verdict. *Id.*

In order to prove entrapment as a matter of law, there must be undisputed evidence that a government agent induced an otherwise innocent person to commit the alleged crime by trickery, persuasion, or fraud. *Id.* "The controlling question on review is

whether the defendant lack[ed] the predisposition to commit the act." *Id.*

Citro argues that the Supreme Court's decisions in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) and *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932) are controlling. Based on the facts in these two decisions the Ninth Circuit has developed five factors to consider when determining the predisposition of the defendant: (1) the character or reputation of the defendant; (2) whether the government made the initial suggestion of criminal activity; (3) whether the defendant engaged in the activity for profit; (4) whether the defendant showed any reluctance; and (5) the nature of the government's inducement. *United States v. So,* 755 F.2d 1350, 1354 (9th Cir.1985); *United States v. Reynoso-Ulloa,* 548 F.2d 1329, 1336 (9th Cir.1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). None of these factors alone indicates either the presence or absence of predisposition, however the most important factor is whether the defendant demonstrated reluctance to engage in the crime which was overcome by repeated Government inducement. *Reynoso-Ulloa,* 548 F.2d at 1336.

Citro points to several pieces of evidence which indicate he was not predisposed to commit the charged offense. It was the government's agent, Milano, who initially suggested the criminal activity, and the government which supplied all the counterfeit credit cards. Furthermore, Citro was initially reluctant to engage in the activity and only agreed after repeated suggestions by Milano, and two expensive dinners paid for by an undercover police officer using counterfeit cards.

Nevertheless, there is substantial evidence which weighs in favor of finding predisposition. Although Milano initiated discussion of the credit card scheme, Citro told Milano that he might know of some merchants who would be willing to accept counterfeit cards. This revelation occurred prior to the two expensive dinners with Schaub. On his own initiative, Citro negotiated a better cut for Schaub on the cash deal with the merchant than Schaub had originally suggested. Citro was obviously savvy enough to insist on patting Schaub down to check for a wire prior to each transaction. Citro engaged in the activity for profit, and the government's inducement of two expensive dinners and a $200.00 fee for each introduction was not overwhelming.

In *United States v. Esquer-Gamez,* 550 F.2d 1231, 1234 (9th Cir.1977), the court rejected the defendant's argument that he was not predisposed to supply cocaine despite his initial reluctance and the fact that he cooperated only after repeated inducements, numbering approximately twenty. The court noted that the only inducement offered the defendant was money. *Id.* Citro's position is very similar to that of the defendant in *Esquer-Gamez.* Although it is true that he did not initiate the idea of a credit card fraud scheme and did not immediately agree to participate, Citro eventually engaged in the scheme fully, and the only inducements offered were money and two expensive dinners.

Viewed in the light most favorable to the government, there was sufficient evidence for a rational trier of fact to conclude that Citro was predisposed to commit the crime. Therefore, the district court did not err in denying Citro's motions for acquittal based on the entrapment defense. Neither was it an abuse of discretion for the trial judge to deny Citro's motion for a new trial based on the same grounds.

## II. *Outrageous Government Conduct*

■ A motion to dismiss an indictment based on outrageous government conduct is a question of law reviewed *de novo.* *United States v. Williams,* 791 F.2d 1383, 1386 (9th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986); *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983).

Due process under the Fifth Amendment warrants dismissal of an indictment only where "the government's conduct is so grossly shocking and so outrageous as to violate the universal sense of justice." *Ramirez,* 710 F.2d at 539 (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)). This defense is similar to that of entrapment

and may be applied where involvement by undercover police officers or informers in contraband offenses is so extensive that due process prevents the conviction of even a predisposed defendant. *Id.; United States v. Gonzales–Benitez,* 537 F.2d 1051, 1055 (9th Cir.1976), *cert. denied,* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). The government's involvement must be *malum in se* or amount to the engineering and direction of the criminal enterprise from beginning to end. *Williams,* 791 F.2d at 1386.

Only two circuit decisions have been found that dismissed indictments based on this defense. In *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978), the Third Circuit overturned convictions where a government agent suggested the creation of a speed laboratory and gratuitously supplied about 20% of the needed glassware, as well as an indispensable ingredient to production. The government also made arrangements with a chemical supply house to facilitate access to the rest of the materials. When problems developed in securing an adequate production site, the government secured an isolated farmhouse at no cost to the defendants. The government provided all the laboratory expertise. Without the government agent, the defendants would not have known how to produce the substance, and the assistance the defendants provided was minimal. *Id.* at 380–81.

In *Greene v. United States,* 454 F.2d 783 (9th Cir.1971), this circuit barred prosecution where the government contacted the defendants after their arrest on previous bootlegging charges and offered to supply the necessary equipment, as well as an operator for a still. The government supplied a large quantity of sugar at wholesale, urged the beginning of production, and was the defendants' sole customer. *Id.* at 786–87. The court held that the government may not involve "itself so directly and continuously over such a long period of time [two and one-half years] in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Id.* at 787.

In the case at hand, the government's conduct rises nowhere near the levels of *Twigg,* 588 F.2d 373, or *Greene,* 454 F.2d 783. While it is true that the government supplied the counterfeit credit cards, and initially raised the idea of a counterfeit credit card scheme, unlike *Twigg* and *Greene,* the government did not create the criminal activity. Visa, Mastercard, and Bank of America had identified an inordinate amount of counterfeit card use in the area. Citro, not the government, was the one who identified potential collusive merchants and made the necessary introductions. The government simply attempted to "attach itself to an on-going ... operation for the purpose of closing it down and prosecuting the operators." *Greene,* 454 F.2d at 787. The courts have recognized that the government may use "stealth and strategy" in fighting crime. *Id.* The conduct of the government in this case was not so egregious as to shock "the universal sense of justice." The trial court did not err in denying Citro's motion to dismiss based on outrageous government conduct.

### III. Citro's Sentence

■ A sentence within the statutory limits is generally not reviewable unless there are constitutional concerns. *United States v. Messer,* 785 F.2d 832, 834 (9th Cir.1986).

Citro's codefendant, one of the merchants involved in the scheme, pled guilty and was sentenced pursuant to the same statute as Citro. The codefendant's sentence, however, was less severe than Citro's. Citro argues that the disparity between his sentence and his codefendant's impinged upon his constitutional right to a jury trial.

In *United States v. Capriola,* 537 F.2d 319, 320–21 (9th Cir.1976), there was a marked disparity between the sentences of the defendants who pled guilty and the sentences of their codefendants who pled not guilty and stood trial. The court held that where such a disparity in sentences suggests that a defendant who pled not guilty was being penalized for exercising his constitutional right to a trial, reasons for the disparity must appear in the record. Where the record is devoid of reasons to support the disparity, a remand is necessary to permit the trial judge to either

ameliorate the sentences or explain the disparity. *See also United States v. Hall,* 778 F.2d 1427, 1428–29 (9th Cir.1985) (emphasizing that *Capriola* applies only where the defendant's constitutional right to stand trial is impinged).[1]

Several factors distinguish Citro's situation from *Capriola.* First, the disparity between the sentences was much greater in *Capriola* than in the case at hand. Second, the record on appeal in *Capriola* was devoid of any reason to support the disparate sentences. *Capriola,* 537 F.2d at 320. In the case at hand, however, Citro had a prior felony conviction for extortion. Furthermore, the judge's statements at sentencing indicate that he took into consideration Citro's individual characteristics and circumstances in imposing sentence. Therefore, because reasons which adequately support Citro's sentence may be found in the record, the fact that Citro's sentence was more severe than his codefendant's does not implicate his constitutional right to stand trial.

AFFIRMED.

---

1. Citro does not cite *Capriola* in support of his argument. Instead he relies on *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). *Solem,* however, is clearly distinguishable. In *Solem,* the Supreme Court held that sentencing a man to life imprisonment for writing a "no account" check for $100 was disproportionate to his crime in violation of the Eighth amendment, even where the man had six prior felony convictions.