**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Laurie Jane LUTTRELL,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**William Dale KEGLEY, aka: Bill
Kegley, Defendant–Appellant.**

Nos. 87–5303, 87–5310.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted July 14, 1988.
Decided Nov. 6, 1989.

807

Donald B. Marks, Beverly Hills, Cal., for defendant-appellant, Luttrell.

Anthony P. Brooklier, Beverly Hills, Cal., for defendant-appellant, Kegley.

Maurice A. Leiter, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before NELSON, REINHARDT and O'SCANNLAIN, Circuit Judges.

NELSON, Circuit Judge:

William Dale Kegley and Laurie Jane Luttrell ("appellants") appeal their convictions of conspiracy to possess and traffic in unauthorized and counterfeit credit card drafts, 18 U.S.C. § 1029(a)(1)–(3) (1982) and attempt to traffic in counterfeit drafts, 18 U.S.C. § 1029(a)(1) and (b)(1) (1982).[1] The court below determined that appellants conspired to process counterfeit and unauthorized credit card drafts and committed overt acts in furtherance of the crime. They challenge the sufficiency of the evidence supporting their convictions. Appellants also appeal the denial of their motion for acquittal based on outrageous government conduct. Appellants raise the following issues: (1) whether the government proved that an overt act was committed in furtherance of the conspiracy; (2) whether the evidence was sufficient to find that appellants had the intent to process counterfeit and unauthorized credit card drafts; (3) whether the credit card drafts involved in this case were unauthorized access devices pursuant to 18 U.S.C. § 1029(e)(3)[2]; and (4) whether the government's conduct was so outrageous that acquittal is warranted. We affirm in part, and remand in part.

## BACKGROUND

Appellants were indicted by a federal grand jury and were convicted of counts one and three. The government dismissed count two prior to trial. Count I charged appellants with conspiracy to possess and

1. 18 U.S.C. § 1029(b)(1) provides, "Whoever attempts to commit an offense under subsection (a) of this section shall be punished as provided in subsection (c) of this section".

2. 18 U.S.C. § 1029(e)(3) provides, "the term 'unauthorized access device' means any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud".

traffic in unauthorized and counterfeit credit card drafts, in violation of 18 U.S.C. § 1029(a)(1)-(3). Count III charged appellants with attempt to traffic in counterfeit drafts, in violation of 18 U.S.C. § 1029(a)(1) and (b)(1).

In 1980 appellant Kegley was operating a business, Complimentary Vacation Club, which offered vacation packages at discount prices via telemarketing. Kegley opened an account with Bank of America where he could deposit the credit card drafts that had been authorized by the customers who had purchased the packages. The bank later canceled the account and returned the drafts. Kegley returned the money that the bank had advanced on the drafts. Because his customers had taken the vacations prior to the bank's action, Kegley suffered a loss of hundreds of thousands of dollars. Kegley kept the returned drafts in his possession for seven years. No criminal or civil actions were brought against Kegley in conjunction with these events.

Richard Barker, a hired government informant and former acquaintance of Kegley's, was instructed by the government to solicit prospective clients for illegal credit card draft deals. Barker was awaiting sentencing for a credit card fraud conviction. The Secret Service set up a fictitious business, Aloha Imports, to investigate telemarketing illegalities. Barker contacted Kegley and informed him that he could help him factor credit card drafts.[3] Andrew Yee was an undercover agent operating Aloha Imports under the name David Young.

On March 12, 1987 Young called Kegley to discuss the possibility of processing credit card drafts. During the phone conversation, Kegley indicated that he had quite a few drafts that were a "little bit old" and some were invalid. Young said that he could process the drafts and that the split of 60/40 between Young and Kegley was negotiable. Young suggested meeting the next day at noon to discuss details and to negotiate Kegley's percentage of the drafts. Young gave Kegley directions to Aloha Imports in Culver City.

On March 13, 1987, Kegley and Luttrell met with Young. Prior to the meeting, the Secret Service had no knowledge of Luttrell. Kegley introduced her as his business associate and she took notes during the meeting. The meeting was recorded and videotaped. Young explained to Kegley how the credit card factoring scheme would work. Young initiated the conversation about factoring the credit card drafts. He represented that he had a company in Honolulu and that he had many contacts in Southeast Asia where he could deposit the drafts.

Young first mentioned that the merchant imprint appearing on the drafts should be changed. Kegley agreed that his name would be removed from the drafts. Kegley did not object to Young's stated desire to change the amounts on the drafts in order that Young could receive a more substantial return. Young informed Kegley that the drafts would have to be deposited into a merchant's account and that the money would be wired to Young's account within 24 hours thereafter. Young announced his plan to fly to Honolulu and then to Singapore on Monday March 16, 1987. Kegley was hesitant and acknowledged the illegality of the scheme. After much hesitation, they agreed that Luttrell would collect the money from the transaction on March 19, 1987 because Kegley was scheduled to be out of town. At the end of

---

**3.** Factoring credit card drafts is a common process in which a merchant who does not have a valid credit card account with a bank, sells the drafts at a discount to a merchant who has an account. The authorized merchant deposits the drafts and obtains payment from the bank and then gives a portion to the original merchant. This form of factoring is not illegal, but may violate the merchant's contract with the bank.

Factoring of unauthorized credit card drafts however is a violation of 18 U.S.C. § 1029 and is often used to obtain immediate payment for invalid drafts. This type of factoring is often the result of telephone operators who obtain credit card account numbers while advertising sham merchandise to members of the public. The account numbers are then used to produce invalid drafts. The payments from the drafts are received before the card holder discovers the fraud and notifies the bank. There is no evidence that Kegley's telemarketing activities fit this illegal model.

the meeting, appellants gave Young nearly $1 million in credit card drafts.

Three days after the transfer, on the morning that Young was to fly to Singapore to factor the drafts, Kegley called Aloha Imports in Honolulu. Agent William Pickering took the call. Kegley asked questions about Young and Aloha Imports. Kegley told Pickering that he wanted to cancel the transaction. He immediately sent a Mailgram stating his desire to cancel the transaction. Young called Kegley after receiving a message from Pickering that Kegley wanted to cancel the deal; Young pretended to be calling from Singapore even though according to the plan he should not have yet left Honolulu.

Kegley definitively stated to Young that he did not want anything to do with the operation and that Young should keep Kegley's share of the profits. Young told him that it was too late, the drafts had already gone through the process and Kegley's share was $800,000. Kegley told Young to keep all of the money. The government then brought charges against Kegley and Luttrell. The trial court instructed the jury about the defense of entrapment. The jury rejected the entrapment defense and convicted Kegley and Luttrell of conspiracy to possess unauthorized credit card drafts and attempt to traffic in counterfeit drafts. The court sentenced Kegley and Luttrell to terms of probation without any period of custody as a condition thereof.

## DISCUSSION

### A. Standard of Review

On a challenge to the sufficiency of the evidence, the standard of review is whether there is substantial evidence to support the conviction. *United States v. Nolan*, 700 F.2d 479, 485 (9th Cir.), *cert. denied*, 462 U.S. 1123, 103 S.Ct. 3095, 77 L.Ed.2d 1354 (1983). The court must view the evidence

in the light most favorable to the government. If any rational jury could find the essential elements of the crime beyond a reasonable doubt, the conviction must be affirmed. *United States v. Dadanian*, 818 F.2d 1443, 1446 (9th Cir.1987), *modified*, 856 F.2d 1391 (1988). The district court's refusal to dismiss the indictment on the basis of outrageous government conduct is reviewed *de novo*. *United States v. Williams*, 791 F.2d 1383 (9th Cir.), *cert. denied sub nom. Sears v. United States*, 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986).

### B. Conspiracy Conviction

■ The evidence was sufficient to support a conspiracy conviction. Appellants Luttrell and Kegley argue that the government failed to prove that an overt act was committed in furtherance of the conspiracy. This circuit has held that the crime of conspiracy is established by an agreement to engage in criminal activity, one or more overt acts taken to implement the agreement, and the requisite intent to commit the substantive crime. *United States v. Indelicato*, 800 F.2d 1482, 1483 (9th Cir. 1986). The Ninth Circuit has specifically required the overt "acts to corroborate unequivocally the criminal intent in a conspiracy". *United States v. Everett*, 692 F.2d 596, 600 (9th Cir.1982), *cert. denied*, 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983).

The indictment in this case charged six overt acts.[4] Only one of these acts must be proven by the government to show conspiracy. *Indelicato*, 800 F.2d at 1483. The transaction on March 13, 1987 in which Kegley and Luttrell gave the undercover agent approximately one million dollars in credit card drafts was an overt act separate from the agreement which corroborates the criminal intent to fraudulently convert credit card drafts. Appellants do

---

**4.** The acts consist of a March 12, 1987 phone conversation between Kegley and an undercover agent of the secret service, the subsequent March 13, 1987 meeting, the agreement by Kegley and Luttrell to supply counterfeit and unauthorized credit card drafts to be processed for payment, Luttrell's instructions to the agent to

alter the expiration dates on the draft and agreement that the agent would change the amount, appellants' agreement to meet on March 19, 1987 to collect their share of the proceeds, and the March 13 transaction where appellants gave the drafts to the agent.

not contest the occurrence of this event. However, they do claim that the acts were not an attempt to effectuate the agreement. Even if the other five alleged overt acts are not separate from the agreement itself, the requirements for proving conspiracy have been made out by the government because the transfer of the drafts is clearly a separate overt act.

■ Appellants claim that their attempts to stop the processing of the drafts are evidence that they did not engage in overt acts. Kegley sent a telex to an undercover agent in Honolulu three days after appellants turned over the drafts. However, in order to avoid complicity in a conspiracy, one must withdraw before any overt act is taken in furtherance of the agreement. *United States v. Sarault*, 840 F.2d 1479, 1487 (9th Cir.1988). The telex was sent three days after the meeting and transfer of the drafts. This attempt to cancel the transaction is a meritless defense to the conspiracy charge.

## C. Attempt Convictions

Appellants claim that their attempt convictions should be reversed based on the defenses of legal and factual impossibility. Legal impossibility exists when the intended acts would not constitute a crime under the applicable law. Factual impossibility refers to those situations in which, unknown to the defendant, the consummation of the intended criminal act is physically impossible.

The defense of legal impossibility is not applicable to this case. Had the contemplated scheme of processing the drafts been carried out, this would have constituted a violation of those statutes at issue in this case. We therefore reject this defense.

■ We also reject the defense of factual impossibility. Although appellants correctly note that their attempted criminal acts could not succeed on the facts of this case, because their supposed co-conspirator was actually a government agent, factual impossibility is generally not a defense to an attempt charge.

## D. Unauthorized access devices

■ Appellants argue that the credit card drafts involved are not unauthorized access devices under 18 U.S.C. § 1029(e)(3). The statute defines an unauthorized access device as an access device that is "lost, stolen, expired, revoked, canceled, or obtained with intent to defraud." The government did not introduce evidence to demonstrate that the drafts possessed by appellants possessed these characteristics. In particular, the government did not show that the appellants acquired the drafts with an intent to defraud. To the contrary, the evidence is that Kegley's customers authorized the charges to their accounts and received the vacation packages that they had purchased. The mere passage of time, in the absence of other factors, does not convert an authorized commercial instrument into an unauthorized instrument. By analogy, had Kegley's customers purchased their vacation packages with checks, his failure to charge them to their accounts, even for seven years, in itself would not convert them into unauthorized or forged instruments. See U.C.C. § 4-404. Therefore, the drafts were not unauthorized access devices under section 1029(e)(3).

However this argument does not require a reversal in this case. Pursuant to the indictment, the jury was not required to find specifically that the credit card drafts were unauthorized access devices. The jury found appellants guilty of counts one and three of the indictment. The count one conspiracy charge involved two violations, namely, § 1029(a)(3) and § 1029(a)(1), (2). Here, the access devices were altered, rendering them counterfeit within the meaning of the statute. Count three charged appellants with attempting to traffic in counterfeit access devices. The statute defines counterfeit access device as any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device. 18 U.S.C. § 1029(e)(2). Where the government charges a defendant with a conspiracy to commit several substantive crimes, the government must prove that

the defendant was engaged in a conspiracy to violate at least one criminal statute. *United States v. Carman,* 577 F.2d 556, 567 (9th Cir.1978). The first object of the conspiracy charged appellants with possession of fifteen or more counterfeit *or* unauthorized access devices. 18 U.S.C. § 1029(a)(3). The second object of the conspiracy charged appellants with trafficking in counterfeit and unauthorized access devices. 18 U.S.C. § 1029(a)(1), (2). Thus, it was not necessary to the jury's verdict that the credit card drafts be classified as unauthorized access devices. Nor was it necessary that the jury find that fifteen or more drafts were counterfeit while in the appellants' possession. It was sufficient that the jury found that the appellants gave the drafts to the agent with the knowledge and intent that the drafts would be counterfeited through alterations. Therefore, evidence was sufficient for the jury to convict appellants of both counts one and three.

*E. Outrageous government conduct*

■ The appellants argue that the district court should have dismissed the indictments against them because of the allegedly outrageous conduct of the government. This argument may rest upon one of two grounds. First, the court may dismiss the indictment if the government's investigatory conduct violated due process. *Hampton v. United States,* 425 U.S. 484, 489, 96 S.Ct. 1646, 1649, 48 L.Ed.2d 113 (1976) (Powell, J., concurring) (Brennan, J., dissenting); *United States v. Russell,* 411 U.S. 423, 431–32, 93 S.Ct. 1637, 1642–43, 36 L.Ed.2d 366 (1973) (Rehnquist, J., concurring). Second, the court may dismiss the indictment pursuant to its general supervisory powers. *United States v. Simpson,* 813 F.2d 1462, 1465 n. 2 (9th Cir.1987). In evaluating these arguments, we focus on the government's behavior and ignore the appellant's predisposition to commit the crime. *See* Lafave & Israel, *Criminal Procedure* 247–59 (1985). Unlike the de-

fense of entrapment, the defense of outrageous government conduct is available even if a defendant was predisposed to commit the crime. *United States v. Gonzales,* 539 F.2d 1238, 1239–40 (9th Cir.1976).

■ The Supreme Court opinions give little guidance by which we may determine whether the government's conduct was outrageous. Therefore, many courts first conduct a "sphygmomanometer test"[5] of the government's conduct to determine if it was " 'so grossly shocking and so outrageous as to violate the universal sense of justice.' " *United States v. Ramirez,* 710 F.2d 535, 539 (9th Cir.1983) (quoting *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.1976), *cert. denied,* 430 U.S. 965, 97 S.Ct. 1644, 52 L.Ed.2d 356 (1977)). In this circuit, very unsavory government conduct alone has failed to cause the dismissal of indictments. In *Simpson,* 813 F.2d 1462, the FBI manipulated a woman into providing sexual favors to a targeted person in order to lure him into selling heroin to undercover agents. In *United States v. Emmert,* 829 F.2d 805 (9th Cir.1987), the government approached a college student and offered to him a $200,000 finder's fee to secure a supply of cocaine for a government agent. As additional incentives, the government provided threats and intimidation. Given these precedents, we can not conclude that the government's unsolicited offer of almost $1,000,000 to appellants to persuade them to make illegal use of a resource that they had obtained legally deserves a higher reading on our judicial sphygmomanometers. Other elements of the government's conduct, such as initiating a discussion of making alterations in the drafts and ignoring the appellant's attempts to withdraw from the scheme, also fail to constitute due process violations. Although this evidence could be relevant to an entrapment defense, *United States v. So,* 755 F.2d 1350, 1354 (9th Cir.1985), the standard for a due process claim is much higher. *Emmert,* 829 F.2d at 811.

---

**5.** A sphygmomanometer is a medical device that measures blood pressure. As an example of government conduct that satisfies the test, some courts cite *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1953). 8 Am.J.Crim.L.

139, 148 n. 35 (1980). In *Rochin,* police broke into the defendant's bedroom, attempted to remove drug capsules from his throat, and, finally pumped his stomach to obtain the evidence. *Rochin,* 342 U.S. at 166, 172, 72 S.Ct. at 206, 209.

In an attempt to satisfy the second ground for a due process violation, *i.e.*, that the government directed and engineered the criminal enterprise from start to finish, the appellants direct our attention to *Greene v. United States*, 454 F.2d 783 (9th Cir.1971). In *Greene*, the government helped reestablish and maintain a criminal bootlegging operation, supplied the essential equipment and ingredients, and was the only customer for the illicit liquor produced. We reversed because we did not believe that "the government may involve itself so directly and continuously over such a long period of time in the creation and maintenance of criminal operations, and yet prosecute its collaborators." *Greene*, 454 F.2d at 787.

*Greene* does not control this case. In *Greene*, the government established an illegal operating structure that functioned for more than two years. In *Greene*, as distinguished from this case, the government's conduct consisted of more than an undercover agent's deceptive conversations with the defendants. We decided in *United States v. Bagnariol*, 665 F.2d 877 (1981), that an undercover agent's conduct in claiming to certain public officials that he represented a fictitious corporation that was interested in illegally promoting the passage of certain legislation did not constitute a due process violation. Recently, we decided in *United States v. Citro*, 842 F.2d 1149 (9th Cir.), *cert. denied*, — U.S. ——, 109 S.Ct. 170, 102 L.Ed.2d 140 (1988) that an undercover agent's conduct in proposing and explaining to the defendant the details of a counterfeit credit card scheme, supplying him with the counterfeit credit cards, and arresting him when he used them, did not constitute a due process violation.

Undercover agents are actors. The success of their performance requires the delivery of lines appropriate to their characters. The agents' mere delivery of language alone, even if enhanced by the use of certain "props," may be necessary to the investigation of established criminal activi-

ty. Such government conduct is unencumbered by *Greene* as long as the government does not operate, for an extended period of time, an actual and illegal apparatus. In this context, dramatic license ends when it goes beyond the stage and endangers the audience. Thus the key factor distinguishing *Greene* from *Bagnariol* and *Citro* is that the government in *Bagnariol* and *Citro* had not established an actual, complete, and long-functioning criminal apparatus. In this case, the government did not create and operate any such criminal apparatus.

In an effort to introduce a third ground for a due process violation, appellants urge that we take special notice of *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978). In *Twigg*, the Third Circuit held that due process barred the government from generating "new crimes by the defendant merely for the sake of pressing criminal charges against him when, as far as the record reveals, he was lawfully and peacefully minding his own affairs. Fundamental fairness does not permit us to countenance such actions by law enforcement officials and prosecution for a crime so fomented by them will be barred." 588 F.2d at 381. Appellants claim that due process was violated when the government launched its "sting" operation without having any basis for believing that the targets of the investigation were engaged in wrongdoing. Indeed, as our review has revealed, there is absolutely no evidence on the trial record that the Secret Service possessed any information linking the appellants or their business with illegal activity. Nor is there even any testimony on the record that the police were aware of criminal activity involving unknown members of a discrete class or group of which appellants might be a part.

Although *Twigg* has not fared particularly well in the courts in general,[6] in this circuit we have suggested on several occasions that the government should have some factual basis for its investigations.

---

6. *See United States v. Driscoll*, 852 F.2d 84, 87 (3d Cir.1988); *United States v. Duvall*, 846 F.2d 966, 974 (5th Cir.1988).

*See Citro,* 842 F.2d at 1153 (government "simply attempted to 'attach itself to an ongoing ... operation for the purpose of closing it down and prosecuting the operators'") (quoting *Greene,* 454 F.2d at 787); *Emmert,* 829 F.2d at 812 ("[g]overnment agents may approach people already engaged in or contemplating criminal activity"); *Simpson,* 813 F.2d at 1470 ("findings contain no suggestion that the FBI agents created the criminal enterprise. To the contrary, the FBI already had a 'tremendous amount of knowledge with regard to [Simpson's] activities' when they targeted him for investigation").

We think that police officers violate constitutional norms when, without reasoned grounds, they approach apparently innocent individuals and provide them with a specific opportunity to engage in criminal conduct.[7] Appellants have struck a familiar chord with their theory of the permissible limits of government conduct. Rooted in the Bill of Rights is a concept that the processes of criminal investigation move deliberately, purposefully and fairly. The fourth amendment, for instance, explicitly requires probable cause; the requirements of substantive due process are more flexible, but there is nothing in the fifth amendment which diminishes "the right to be left alone—the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States,* 277 U.S. 438, 478, 48 S.Ct. 564, 572, 72 L.Ed. 944 (1928) (Brandeis, J., dissenting). The principle that people who are scrupulously conforming to the requirements of the law should not be made the objects of highly intrusive, random police investigations is an important ingredient of our liberty. We see substantial mischief in any pattern of law enforcement that arbitrarily targets for intrusion the lives of individuals who, to all reasonable appearances, are minding their own business.

The government argues that although arbitrary or suspicionless investigations directed at apparently innocent people may not be ideal, they are a necessary element of effective crime detection and prosecution. *See Russell,* 411 U.S. at 432, 93 S.Ct. at 1643. Indeed, we have noted that "stealth and strategy" enables the police to ferret out certain narcotics and contraband rings. *See United States v. Williams,* 791 F.2d 1383 (9th Cir.), *cert. denied,* 479 U.S. 869, 107 S.Ct. 233, 93 L.Ed.2d 159 (1986). We agree that, in some circumstances, it is essential for the police to use undercover agents to attach themselves to ongoing activities; stripped of the ability to infiltrate criminal organizations, government investigators might be severely hampered in the prosecution of members—especially higher-level members—of sophisticated criminal conspiracies. *See Citro,* 842 F.2d at 1153.

However, while we are generally reluctant to disagree with the government on matters of law enforcement policy, the governmental interest in conducting suspicionless investigations is weak at best. Undercover investigations aimed at known or suspected criminal operations have a settled place in law enforcement. Operations directed at targets whom the police have no reason to suspect may occasionally uncover evidence of crime, but as a general method of conducting criminal investigations, they constitute an inefficient as well as arbitrary means of law enforcement.

It may seem unlikely that competent police investigators would pursue an operation that has no foundation in either individualized evidence or a reasonable suspicion that at least some indeterminate members of a limited class are engaged in illegal activity. However, in this case, the investigation utilized the services of an informant, a member of a group that in its eagerness to gain rewards does not always obey the niceties of police protocol. Many informants play their roles because of completed or prospective plea bargaining arrangements. They have a strong incentive to find targets for police investigation, regardless of the reasonableness or the accu-

---

7. The issue in this case differs from a claim of entrapment. The entrapment defense turns on the defendant's predisposition. *See Russell,* 411 U.S. at 433, 93 S.Ct. at 1643. The test laid down here focuses exclusively on the government's conduct. Thus, while both issues may arise in a case, they present analytically different questions.

racy of their information. Their tips to the police may be based either on legitimate information about the criminal underworld or they may be wholly fabricated. The origin of the information may be direct observation or it may be innuendo, conjecture or even just plain animus. While in some cases informant activities may be conducted in a fair and decent manner, in others there appears to be little regard for fundamental concepts of honesty and fair play. We see substantial reason to scrutinize these operations for government overreaching and to do so with the greatest care.

We need not reverse the convictions outright in this case. The trial record contains hints that the Secret Service may in fact have had a factual basis for targeting appellants. The district court's summary dismissal of appellant's outrageous conduct motion precluded the full development of the record. On remand, the district court must determine whether the government had reasoned grounds for approaching appellants and offering them the opportunity to participate in a criminal scheme. Until the record has been sufficiently developed, we will forego the temptation to comment further concerning what circumstances may constitute reasoned grounds. In any event, it is appropriate that the district court make the initial judgment.

## CONCLUSION

The evidence was sufficient for the jury to conclude that the appellants had engaged in a conspiracy. The appellants' impossibility defense fails because their actions clearly indicate an intent to violate the law. Their argument that the drafts were not unauthorized access devices under the statute is not relevant. The jury verdict did not require evidence that the drafts were unauthorized; the government presented adequate evidence that the drafts were to be counterfeited through alteration. On remand, the district court must determine, based upon a fully developed record, whether the government's investigatory efforts proceeded from reasoned grounds.

AFFIRMED IN PART and REMANDED IN PART.