### UNITED STATES of America

v.

### Neil W. STEINHORN, et al.

### Crim. No. PN–90–0022.

United States District Court,
D. Maryland.

May 25, 1990.

---

Breckinridge L. Willcox, U.S. Atty., Gary P. Jordan, First Asst. U.S. Atty., David P. King, Asst. U.S. Atty., D.Md., for plaintiff.

Richard M. Karceski, White & Karceski, Towson, Md., for defendant Neil W. Steinhorn.

Jerome Blum and Charles G. Bernstein, Baltimore, Md., for defendant Eugene Petasky.

## OPINION

NIEMEYER, District Judge.

Neil Steinhorn and Eugene Petasky, who are charged with conspiring to transport stolen gold jewelry in interstate commerce, have filed motions to dismiss the indictment. The indictment also charges Steinhorn with money laundering and related violations. The defendants contend that the government targeted them for a "sting" operation without a "reasonable suspicion" to believe that either of them was involved in illegal activity. Contending that the sting operation was motivated solely to force defendants to cooperate in the investigation of public corruption, they argue that the government's conduct was "outrageous" and therefore violated their due process rights under the Fifth Amendment. Petasky has also filed a motion to sever his trial. Both the motions to dismiss and the motion to sever will be denied.

### I.

On November 8, 1988, Christopher Turner approached the FBI and is reported to

have said that his attorney, Neil Steinhorn, had offered to exchange Turner's stolen gold jewelry and stolen money for "clean" cash. At that time, Turner had pleaded guilty to criminal charges in state court and had been released pending sentencing to allow him to make restitution and to cooperate with the police in making drug purchases. Apparently Turner thought that he could better himself at sentencing, which was then scheduled for two months later, if he also cooperated with the FBI against his attorney, Steinhorn.

Without verifying any of the information that Turner provided and without inquiring into Turner's background, the FBI wired Turner with a body sound-recording device which documented meetings between Turner and Steinhorn. During these meetings beginning on November 18, 1988, Steinhorn and Turner discussed converting Turner's stolen gold jewelry to cash and laundering $250,000 in money purportedly stolen from an armored truck. Steinhorn described how Petasky would assist in converting the gold and how money could be routed through Steinhorn's escrow account in amounts under $10,000 to an account on the island of Nevis in the Caribbean and then back to the United States.

The FBI continued the investigation into late December 1988, secretly recording meetings and telephone calls between Turner and Steinhorn. After a telephone call on December 20, 1988, Turner disappeared, never to be heard from again. The FBI continued the investigation with one of its own special agents posing as a partner of Turner and using the alias "Slim."

The investigation, during which some fifty or sixty conversations were recorded, led the FBI to the co-defendant Petasky. The FBI supplied its own gold and money as the stolen gold and money, and the investigation documented the sale of the gold through the defendants to a precious metal dealer from Cincinnati, Ohio. It also documented the money laundering scheme. The investigation concluded in May 1989. The defendants were indicted in January 1990, and a superseding indictment was filed in February 1990.

Both defendants have moved to dismiss the indictment, arguing that the government had no "reasonable suspicion" to target either of them for investigation. They contend that Turner was already working for the DEA when he approached the FBI and they suggest, although no evidence has been advanced, that the DEA and the FBI put Turner up to inducing Steinhorn to commit the offenses with which he is charged. The real motive, they argue, was to obtain leverage against Steinhorn to force him to cooperate in investigations against his father and high-ranking state government officials. They point to a failed investigation two years earlier when Steinhorn was monitored by tape recording devices on an informant in an investigation in which it was believed Steinhorn was a conduit to corrupt public officials. That investigation yielded no indictments.

The defendants contend that the uncorroborated information of an informant of dubious credibility, even when coupled with the results of a fruitless investigation from two years earlier, does not provide a reasonable suspicion to justify the "sting" operation. They contend that the real motive for the operation was to obtain leverage that could be used for other investigations. They urge that this conduct amounts to "outrageous governmental conduct."

II.

The foundation of defendants' argument is the contention that due process requires that before the government can undertake an undercover "sting" operation, it must have a "reasonable suspicion" that the target of the operation has violated the law. They rely on two decisions, one from the Eighth Circuit and one from the Ninth. *United States v. Jacobson*, 893 F.2d 999 (8th Cir.1990); *United States v. Luttrell*, 889 F.2d 806 (9th Cir.1989). Since oral argument in this case, the opinion and judgment in *Jacobson* were vacated, and a rehearing was granted. 899 F.2d 1549 (8th Cir.1990). Oral argument was heard on May 17, 1990. Defendants' argument rests on a notion that the government ought not to approach apparently innocent members

of society and provide them with the opportunity for committing crime.

The government contends that due process imposes no such restriction on law enforcement officials. On the contrary, it argues that a defendant who is predisposed to committing a crime ought not to be shielded from prosecution because of the conduct of law enforcement officers, unless the conduct is so "outrageous that due process principles would absolutely bar" the prosecution. *United States v. Russell,* 411 U.S. 423, 431, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). *See also Hampton v. United States,* 425 U.S. 484, 493–95, 96 S.Ct. 1646, 1651–53, 48 L.Ed.2d 113 (1976) (Powell, J., concurring). The government argues that the standard adopted by the Eighth and Ninth Circuits in *Jacobson* and *Luttrell* is not the law of the Fourth Circuit and other circuits. The government contends additionally that it had a "reasonable suspicion" to initiate the undercover operation against the defendants and that the conduct of its law enforcement officials cannot in any sense be characterized as "outrageous."

■■■ Defendants' argument that the initiation of a "sting" operation without reasonable suspicion violates due process and bars a subsequent prosecution is to be distinguished from the defense of entrapment. A due process violation, which occurs during the investigation of a crime, may preclude prosecution of that crime. *See, e.g., Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43. Entrapment, on the other hand, is a defense that is raised by a defendant that he was not predisposed to commit the offense. While the cases preserve a distinction, *see United States v. Hunt,* 749 F.2d 1078, 1087 (4th Cir.1984), *cert. denied,* 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), and *Luttrell,* 889 F.2d at 813 n. 7, the facts giving rise to each are related to the point that one may be but an aggravation of the other. If the government's conduct in the investigation through a sting operation is so active that its conduct fabricated elements of the offense, it might be considered a violation of due process to prosecute the defendant. *See United*

*States v. Twigg,* 588 F.2d 373 (3d Cir.1978); *Greene v. United States,* 454 F.2d 783 (9th Cir.1971). The same facts, if they relate to whether the defendant would have committed the crime at all, also could be argued to form the basis of the entrapment defense. On the other hand, if entrapment by the government is the only basis for the argument that due process was lacking in the investigation, then the due process argument must fail. The defendant's rights are preserved by the availability of the entrapment defense. But entrapment is not a ground that the government's prosecutorial conduct failed on such an elemental level that the indictment must be dismissed.

In this case the defendants argue that the government had no suspicion that the defendants had committed or would commit a crime. They argue that the government targeted them for a sting operation without a "reasonable suspicion" and that only once the operation was put into place did the defendants arguably yield to criminal conduct. The sting operation consisted of wiring informants who conducted commercial activity with the defendants in the ordinary course. In the case of the defendant Steinhorn, the undercover agents sought assistance in laundering "dirty money" and selling "hot gold." In the case of Petasky, the informant sought his assistance in selling "hot gold."

■■ It is readily accepted that law enforcement officials may conceal their investigatory activities when collecting evidence against potential defendants without compromising any principles of fairness or propriety. These activities include for example remote observation, undercover conduct such as for the purchase of drugs, the tape recording of conversations, the use of informants, and the analysis of business and bank records unbeknownst to the targets of the investigation. Restrictions are imposed when the activity reaches to spheres considered private. *See, e.g., Rakas v. Illinois,* 439 U.S. 128, 143–44, 99 S.Ct. 421, 430–31, 58 L.Ed.2d 387 (1978) (protection of Fourth Amendment depends on whether there is legitimate expectation of privacy). *Cf. California v. Greenwood,* 486 U.S. 35,

108 S.Ct. 1625, 100 L.Ed.2d 30 (1988) (no expectation of privacy in garbage left at curbside for collection). In this case the defendants make no suggestion that the activities of the government invaded private spheres and no Fourth Amendment defense has been raised.

■ Law enforcement officials and prosecutors are not restricted by being required to have a reasonable suspicion to observe or investigate persons in public and public data. Law enforcement officials may investigate citizens in the public conduct of daily activity to detect those who commit crime. And even from those observations, prosecutors have broad authority to decide whether to prosecute. *See United States v. Batchelder*, 442 U.S. 114, 124, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979).

■ Therefore, in the absence of those circumstances when privacy is preserved under the Fourth Amendment, our Constitution and laws do not impose a requirement of "reasonable suspicion" on law enforcement officials prior to investigating a member of society. The same is so regardless of the method of investigation, so long as it does not impinge on constitutionally-protected spheres of privacy. Only when steps are taken toward intruding into that which is preserved as private does the law require increasing the levels of suspicion. Thus, a "reasonable suspicion" is required for a stop and frisk. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). And, of course, search warrants will not be issued, "but upon probable cause." U.S. Const. amend. IV. That the method of investigation is a "sting operation" does not alone impose any further restrictions on law enforcement officials than does an observation. A sting operation increases the potential for a defense of entrapment and, in the extreme, could conceivably lead to enforcement conduct considered so "outrageous" as to have due process implications. *See United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), and *Greene v. United States*, 454 F.2d 783 (9th Cir.1971).

■ Short of conduct so outrageous as to bar prosecution, however, the transgressions of law enforcement officials should not be permitted to interfere in the right of the people through the grand jury to institute charges for criminal conduct. Law enforcement officials are subject to restrictions of employment, statutory regulation, ethics and other governmental supervision. Their transgressions in investigating crimes, while unacceptable in their own right, ordinarily are not relevant to the guilt or innocence of a defendant who is otherwise predisposed to the commission of the crime, unless the transgressions amount to that conduct considered so outrageous as to implicate due process.

The jurisprudential origins of a due process argument attack of the type advanced here by the defendants are found in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), and *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976). *See, e.g., Luttrell*, 889 F.2d at 811. These cases, however, do not support the "reasonable suspicion" standard imposed in *Jacobson* and *Luttrell*.

In *Russell*, the Supreme Court held that the entrapment defense provided no refuge to a defendant who was predisposed to commit a crime even though the government furnished a necessary ingredient for the crime. 411 U.S. at 433–36, 93 S.Ct. at 1643–45. The Court added, however, that "we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1642–43.

In *Hampton*, the Supreme Court addressed a due process argument in circumstances where government activity was yet more aggressive than that in *Russell*. In *Russell* the government had supplied to the defendant a legally available ingredient that was necessary to the manufacture of an illicit drug; whereas in *Hampton* the government allegedly furnished the illicit drug itself which became the *corpus delicti* of the conviction. A divided Court affirmed the conviction nonetheless. Justice Powell concurred in the result, joined

by Justice Blackmun. They agreed that no due process violation occurred on the facts of the case but took issue with the plurality's conclusion that entrapment was the sole defense available when the defendant acts in concert with government informers. While noting the "doctrinal and practical difficulties of delineating limits to police involvement in crime," Justice Powell stated that he was "unwilling to join the plurality in concluding that, no matter what the circumstances, neither due process principles nor our supervisory power could support a bar to conviction in any case where the Government is able to prove predisposition." *Id.*, 425 U.S. at 494–95, 96 S.Ct. at 1652–53 (Powell, J., concurring) (citations omitted).

The *Hampton* case suggests, however, that the "outrageous conduct" defense should be applied with prudence. Justice Powell noted that courts "should be extremely reluctant to invoke the supervisory power in cases of this kind because that power does not give the 'federal judiciary a "chancellor's foot" veto over law enforcement practices of which it [does] not approve.'" *Hampton*, 425 U.S. at 494, 96 S.Ct. at 1652 (Powell, J., concurring, quoting *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644). Nowhere do the plurality or concurring opinions give any indication that a government investigation which was begun on anything less than reasonable suspicion would constitute "outrageous conduct."

Most importantly, the Fifth Amendment due process clause makes no such specific demands. Due process historically has not encompassed the standard suggested by the defendants. No current notion of a fair criminal process requires that before law enforcement officials may investigate citizens and their conduct in spheres not protected by notions of privacy, the officers must have reasonable suspicion that a crime is being committed or is about to be committed. On the contrary, it is by that very investigation that a reasonable suspicion is reached to justify stops or probable cause is established to justify searches. Were the Court to apply a requirement that a reasonable suspicion precede an investigation, it would be reaching far beyond the rights secured by the Constitution to become an overseer of police investigatory tactics. The "reasonable suspicion" standard would effectively give to the judiciary a " 'chancellor's foot' veto," a circumstance decried by the Supreme Court in *Hampton* and *Russell*. *Hampton*, 425 U.S. at 494, 96 S.Ct. at 1652 (Powell, J., concurring); *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644.

Moreover, the defendants' proposed standard harkens back to the so-called "objective view" of entrapment, which focuses on the government's conduct instead of the defendant's motives, and which has been rejected by the Supreme Court. *See, e.g.*, *Russell*, 411 U.S. at 439–50, 93 S.Ct. at 1646–52 (Stewart, J., dissenting). As the Third Circuit noted in *United States v. Jannotti*, 673 F.2d 578 (3d Cir.), *cert. denied*, 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982), rejecting a "reasonable suspicion" standard:

> We must necessarily exercise scrupulous restraint before we denounce law enforcement conduct as constitutionally unacceptable; the ramifications are wider and more permanent than when only a statutory defense is implicated.
>
> We must be careful not to undermine the Court's consistent rejection of the objective test of entrapment by permitting it to reemerge cloaked as a due process defense. While the lines between the objective test of entrapment favored by a minority of the Justices and the due process defense accepted by a majority of the Justices are indeed hazy, the majority of the Court has manifestly reserved for the constitutional defense only the most intolerable government conduct.

673 F.2d at 607–08.

Other circuits have specifically rejected the requirement for "reasonable suspicion." *E.g.*, *United States v. Jenrette*, 744 F.2d 817, 823–24 & n. 13 (D.C.Cir.1984), *cert. denied*, 471 U.S. 1099, 105 S.Ct. 2321, 85 L.Ed.2d 840 (1985); *United States v. Gamble*, 737 F.2d 853, 856–60 (10th Cir. 1984); *United States v. Myers*, 692 F.2d 823, 836–37 (2d Cir.1982), *cert. denied*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322

(1983). Furthermore, and more importantly for this case, the Fourth Circuit declined in *United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir.1970), *cert. denied*, 402 U.S. 950, 91 S.Ct. 1604, 29 L.Ed.2d 119 (1971), to accept "reasonable suspicion" as a threshold. Although *DeVore* was decided before *Russell* and *Hampton*, those two cases do not call for a different result.

After *Russell* and *Hampton*, the Fourth Circuit rejected a claim of "outrageous conduct" by the government. In *United States v. Hunt*, 749 F.2d 1078 (4th Cir. 1984), *cert. denied*, 472 U.S. 1018, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985), the court upheld a governmental investigation because the government had not engaged in "an indiscriminate government fishing expedition," nor had the government "incessantly hectored" the defendant to participate in criminal activity. *Hunt*, 749 F.2d at 1087. The government had merely pursued "available leads," some of which proved fruitful while others did not. *Id.* Similarly, the Fourth Circuit has rejected in other cases due process attacks on government investigations based on allegedly "outrageous conduct." *See United States v. Chavis*, 880 F.2d 788, 793–94 (4th Cir.1989); *United States v. Goodwin*, 854 F.2d 33, 36–37 (4th Cir.1988); *United States v. Milam*, 817 F.2d 1113, 1114–16 (4th Cir.1987). Although the "reasonable suspicion" standard was not applied in any of these cases, they clearly suggest the position of the Fourth Circuit that courts should not inquire further into a police investigation than to determine whether the government's conduct was "outrageous."

It appears that only two circuits have set aside convictions based on "outrageous conduct." *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978); *Greene v. United States*, 454 F.2d 783 (9th Cir.1971). In *Greene*, the government labored for a period of two and one-half years to create and maintain a bootlegging business and was so enmeshed in the criminal operation that prosecution was barred. In *Twigg*, the government manufactured the criminal activity. It supplied the necessary ingredient, equipment, and laboratory for the manufacture of methamphetamine, and it demonstrated the manufacturing process to the novice defendants. Moreover, there is some doubt as to the continuing validity of *Twigg*. *See United States v. Beverly*, 723 F.2d 11, 12 (3d Cir.1983).

The Court thus concludes that due process does not require that the government have a reasonable suspicion before it can undertake an investigation. The initiation of an investigation of a citizen without reasonable suspicion that he has or is about to commit a crime is not conduct so outrageous as to bar prosecution.

■ In the case before the Court, moreover, the Court finds that the government did have a reasonable suspicion for proceeding with the investigation of both Steinhorn and Petasky. The government acted upon the tip of an informant that defendant Steinhorn was willing to convert stolen gold into cash and to launder "dirty" money. Moreover, the government had discovered in an investigation of Steinhorn two years earlier that he was willing to break the law. The government did not engage in "an indiscriminate fishing expedition." *Hunt*, 749 F.2d at 1087. To the contrary, the facts submitted to the Court reveal that the design of the criminal conduct was created by the defendant Steinhorn, and he, in turn, led the government to Petasky. No evidence has been advanced to show that the government targeted Steinhorn in this case to facilitate an investigation of his father and high-ranking government officials, even though it can hardly be suggested that to have done this was illegal.

While the Court will deny the motions to dismiss the indictment because of alleged outrageous conduct by the government, the defendants are free, of course, to advance at trial an entrapment defense if the facts so indicate.

### III.

To justify a severance of his case, Petasky urges (1) that in a joint trial he will be implicated by statements of Steinhorn in violation of the holding in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20

L.Ed.2d 476 (1968); (2) that the defenses of each defendant are so antagonistic that the conflict alone will unjustifiably suggest the guilt of both defendants; and (3) that the evidence against Steinhorn on the charges directed solely against him will "spill over" and implicate Petasky, particularly when Steinhorn, as an attorney, may be held to a higher standard in the public's eye than otherwise would be imposed on Petasky.

Under *Bruton,* the government cannot use Steinhorn's statements made beyond the scope of the conspiracy to known law enforcement officials that implicate Petasky if Steinhorn elects not to testify at trial and subject himself to cross examination. Otherwise, Petasky's rights under the Sixth Amendment confrontation clause could be violated. The government claims, however, that if there are statements of Steinhorn that are sought to be introduced at trial which fall within the prohibitions of *Bruton* and Steinhorn elects not to testify, it will delete any mention of Petasky, thus alleviating any confrontation clause problem. *Richardson v. Marsh,* 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Alternatively, the statement can be excluded.

Similarly, the antagonistic-defenses claim does not mandate a severance. "[I]t must be demonstrated that the conflict is so prejudicial that the differences are irreconcilable, 'and that the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.'" *United States v. Becker,* 585 F.2d 703, 707 (4th Cir.1978), *cert. denied,* 439 U.S. 1080, 99 S.Ct. 862, 59 L.Ed.2d 50 (1979). Petasky has not made this showing. Although he has suggested a defense that is antagonistic to Steinhorn, Steinhorn has not given any indication that he will implicate Petasky in the wrongdoing. Petasky cannot demonstrate that he will be prejudiced by the fact that he intends to blame Steinhorn for any wrongdoing.

Finally, on the claim that Petasky will be prejudiced by a "spillover" effect of evidence, the Court has discretion to grant a severance. An allegation of conspiracy, however, creates a presumption in favor of joinder. *See United States v. Spitler,* 800 F.2d 1267, 1271 (4th Cir.1986). Moreover, the defendant has a heavy burden to establish that prejudice will result from a joint trial. *See, e.g., United States v. Brugman,* 655 F.2d 540, 543 (4th Cir. 1981). Petasky has failed to satisfy this burden. He is charged in a conspiracy with Steinhorn, and the fact that Steinhorn is a lawyer should not prejudice Petasky. The Court cannot assume that the jury will violate its oath to decide fairly, based on the evidence, simply because a lawyer has been named as a co-defendant. The disparity in the weight of the evidence against various co-defendants is not in these circumstances persuasive. It can be urged as forcefully that the jury will distinguish Petasky's involvement from that of Steinhorn and, when comparing the two, conclude that the proof against Petasky fails to meet the burden of proof imposed on the government.

For the reasons given in this Opinion, the motions of the defendants to dismiss the indictment and the motion of Petasky for a severance will be denied.