**UNITED STATES of America,
Plaintiff–Appellant,**

v.

**Daniel J. HART; Paul G. O'Connell,
Defendants–Appellees.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel J. HART, Defendant–Appellant.**

**Nos. 91–30182, 91–30254.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 8, 1992.

Decided May 7, 1992.

Barry McHugh, Asst. U.S. Atty., Boise, Idaho, for U.S.

Ellison M. Matthews, Boise, Idaho, for Paul G. O'Connell.

Lance D. Churchill, Churchill & Vander Boegh, Boise, Idaho, for Daniel J. Hart.

Before: BROWNING, WRIGHT, and FERNANDEZ, Circuit Judges.

FERNANDEZ, Circuit Judge:

The United States appeals the district court's grant of Paul O'Connell's motion for acquittal and Daniel Hart's motion for acquittal following their jury convictions for conspiracy to distribute cocaine. Hart also made a motion for a new trial. The court granted these motions after the jury acquitted O'Connell of distributing or aiding and abetting the distribution of cocaine. Hart appeals his jury convictions for distributing cocaine on the grounds that he was entrapped and that the government's conduct was outrageous. We reverse the grant of the motions and otherwise affirm.

## BACKGROUND

Hart and O'Connell were charged with distributing or aiding and abetting the distribution of cocaine as well as conspiring together or with known or unknown persons to distribute cocaine. Hart was also charged with two separate counts of distributing cocaine. This prosecution arose from a government sting operation in Sun Valley, Idaho. Wayne Joler, a former resident of Sun Valley, was indicted on charges of drug trafficking and income tax evasion. Joler pled guilty to one count of income tax evasion and agreed to become a government informant. Joler's sentence was suspended so that he could return to Idaho and re-establish his contacts with cocaine suppliers.

Joler had used cocaine with Hart in the past, and upon returning to Idaho he struck up a friendship with Hart. Joler testified that when he raised the subject of buying cocaine, Hart told him that he was "in the business":

Q. Prior to July 12, had you been talking to [Hart] about buying cocaine?

.    .    .    .    .

A. I would think so, yes.

Q. How would that come up?

A. Well, [Hart] was working in a restaurant, ... and I was over there one night for a golf thing, and I just kind of, basically, asked him if he was in the business, and he said yes, and can we do anything, and he said yes, we can.

Hart undertook to obtain cocaine for Joler. On July 12, 1989, Joler gave Hart $800 for the purchase of cocaine. Hart left to meet a source he called "Doug" and was followed to the corner of Highway 75 and Greenhorn Road, where he met with an unidentified person in a small silver car. Hart returned to his residence and gave the cocaine to Joler in exchange for an additional $100. On July 24, 1989, Joler purchased cocaine from Hart for $450.

The events of August 24, 1989 implicated O'Connell as well as Hart. Joler sought to purchase a larger amount of cocaine—$2,000 worth—and both Hart and Joler went in search of Hart's source, "Paully." In an attempt to locate Paully, Hart took Joler first to a construction site where Paully was working, then to Paully's residence, and then back to the construction site. Hart eventually found Paully, identified as O'Connell, standing outside the construction site. Hart told O'Connell that they had $1,500 in cash. Hart and O'Connell conversed about golf and the purchase of a tool box; Joler testified that the conversation was about the purchase of cocaine. O'Connell said that he would check and call Hart in twenty minutes. Hart told Joler that O'Connell was going to pick up

the cocaine. Joler and Hart then went to a restaurant, where Hart said he saw Paully drive by and that Paully was going to Hart's residence. At this moment O'Connell's car drove by. Hart and Joler returned to Hart's residence.

O'Connell left the construction site after Hart and Joler and briefly visited an art gallery. O'Connell placed a phone call at the same time as Hart received a phone call from his source delaying the transaction until the evening. Joler returned to Hart's residence at 7:00 p.m. that evening with $2,000. O'Connell subsequently drove past Hart's residence and proceeded to meet with the owner of the art gallery. O'Connell then went to Hart's residence, but left when he apparently saw two officers conducting surveillance. After receiving a phone call, Hart informed Joler that his source had "bad vibes" and that Hart needed to use Joler's car to pick up the cocaine. Hart drove to the corner of Highway 75 and Greenhorn Road where he was seen meeting with O'Connell. Hart returned to his residence and gave Joler cocaine which he claimed to have purchased from "Herby."

Joler later made unsuccessful attempts to purchase cocaine from Hart. On August 30, 1989, Joler delivered $4,000 to Hart for a cocaine purchase. O'Connell subsequently visited Hart's residence briefly. Joler met with Hart twice more that day but Hart was unable to arrange a purchase and eventually returned Joler's money. The next day Joler had four telephone conversations with Hart but again Hart was unable to arrange a purchase.

O'Connell testified that his conversation with Hart at the construction site was about playing golf and that he went to the art gallery to check on a job. O'Connell and his alibi witnesses said that he was mountain bike riding at the time he was allegedly seen with Hart at the highway intersection.

While the jury was deliberating, the jury asked the judge whether Hart could only be convicted of conspiring with O'Connell or whether Hart could be convicted of conspiring with an unknown person. The judge said "no." The jury subsequently convicted Hart on all counts and convicted O'Connell of conspiracy. However, the jury acquitted O'Connell of distributing or aiding and abetting the distribution of cocaine.

The district court then granted O'Connell's motion for acquittal on the conspiracy count because of O'Connell's acquittal on the distribution count. *See* Fed. R.Crim.P. 29. The court further ruled that since there was no evidence of an agreement between Hart and any other alleged co-conspirator, Hart had to be acquitted of the conspiracy count as well. The court granted Hart's motion for a new trial on the conspiracy count in the event the motion for acquittal were reversed on appeal. *See* Fed.R.Crim.P. 33.

## JURISDICTION

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 18 U.S.C. § 3731 and 28 U.S.C. § 1291.

## DISCUSSION

### A. *O'Connell's Motion for Acquittal*

■ We review *de novo* the legal determination whether a defendant may upset a verdict because it is inconsistent with an acquittal. *United States v. Smith*, 802 F.2d 1119, 1126 (9th Cir.1986). The district court perceived an inconsistency between the jury's acquittal of O'Connell on Count IV, the charge of distributing or aiding and abetting the distribution of cocaine, and its conviction of him on Count I for conspiring to distribute cocaine. We agree that there could be an inconsistency. The evidence in support of Count IV—O'Connell's meeting with Hart and Joler at the construction site on August 24, his movements that day, his alleged meeting with Hart at the highway intersection that evening, and his meeting with Hart on the morning of August 30—is the same evidence that suggests a conspiracy between Hart and O'Connell to distribute cocaine. We cannot agree with the conclusion that O'Connell must be acquitted.

The specter of inconsistent verdicts has haunted the courts for many years. We sense an injustice when we encounter it, but it is difficult to ascertain who has been subjected to the injustice. Is it the government (all of us) because a defendant has been improperly acquitted of an offense, or is it the defendant (and all of us) because he has been improperly convicted of an offense? We may never know the real facts, but the Supreme Court has given us the legal answer. In *Dunn v. United States*, 284 U.S. 390, 393, 52 S.Ct. 189, 190, 76 L.Ed. 356 (1932), the Court said:

> Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment.... If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold.

After *Dunn* a number of circuits—including ours—believed that they had found some exceptions to that general rule, but in *United States v. Powell*, 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) the Supreme Court disagreed, although it did shift the basis of the rule from the principle of res judicata to other principles. In so doing, it recognized the intellectual difficulties that inconsistent verdicts can cause. As it said:

> [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

*Id.* 469 U.S. at 65, 105 S.Ct. at 476. Nevertheless, the Court rather clearly felt that the arguments for exceptions to the *Dunn* rule were "imprudent and unwork-

able...." *Id.* 469 U.S. at 66, 105 S.Ct. at 477. It concluded by reflecting upon the intractable character of the problem and stating:

> Given this impasse, the factors detailed above—the Government's inability to invoke review, the general reluctance to inquire into the workings of the jury, and the possible exercise of lenity—suggests that the best course to take is simply to insulate jury verdicts from review on this ground.

*Id.* 469 U.S. at 68–69, 105 S.Ct. at 479 (footnote omitted).

So the rule has stood for decades. While we are unable to say that in the course of the development of constitutional principles over the decades to come an exception will never be found, we perceive none at this time, or at least none that go beyond the normal safeguards against jury irrationality mentioned in *Powell*, 469 U.S. at 67, 105 S.Ct. at 478.

In stating this we might be accused of some lack of imagination, for O'Connell earnestly presses the decisions in *United States v. Guzman*, 849 F.2d 447 (9th Cir. 1988) and *United States v. Morales*, 677 F.2d 1 (1st Cir.1982) upon us. It is true that in *Morales*, the First Circuit believed that it had found an exception when the only overt acts before the jury for conspiracy purposes were the substantive offenses themselves. However, *Powell*, 469 U.S. at 63, 105 S.Ct. at 475, cast a jaundiced eye upon *Morales* and the First Circuit has since administered the coup de grace. *See United States v. Bucuvalas*, 909 F.2d 593 (1st Cir.1990).

■ *Guzman*, too, offers O'Connell little or no succor. What is most interesting about *Guzman* is that we rejected the notion that an inconsistency requires a reversal. "Inconsistent verdicts may stand, even when a conviction is rationally incompatible with an acquittal, provided there is sufficient evidence to support a guilty verdict." 849 F.2d at 448 (citation and quotation omitted). While we went on to speak approvingly of the now moribund *Morales* case, it can hardly be thought that we

meant to establish that case as the rule for this circuit, since we also pointed out that its principles had no application to Guzman himself. Indeed, even aside from the Supreme Court's insistence that jury verdicts be insulated from speculation about their bases, we pointed out that the evidence in *Guzman* could lend itself to scenarios that would demonstrate no inconsistency whatever. If so, the specter of inconsistency was a will-o'-the-wisp and did not have to be banished by *Powell.* It is, therefore, not surprising that *Powell* was not even cited in the opinion.

Much the same can be said here. We can imagine scenarios wherein O'Connell could be a conspirator and still have avoided criminal responsibility for the substantive offenses. We go further, however. We see no reason to engage in that interesting intellectual exercise, for even if we did and discovered a true inconsistency, *Powell* tells us that the inconsistency cannot be considered.

Therefore, we must reverse the district court's determination that O'Connell's conviction of conspiracy cannot stand.

### B. *O'Connell's Claim of Insufficiency of the Evidence*

We review the sufficiency of the evidence for a given count "independent of the jury's determination that evidence on another count was insufficient." *Powell,* 469 U.S. at 67, 105 S.Ct. at 478. Therefore O'Connell's acquittal on the distribution count does not affect our consideration of the evidence supporting his conviction for conspiracy. We must determine "if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of the elements of the crime." *Guzman,* 849 F.2d at 447. "The essential elements of conspiracy ... are an agreement to accomplish an illegal objective coupled with one or more overt acts in furtherance of the illegal purpose and the requisite intent necessary to commit the underlying substantive offense." *United States v. Melchor–Lopez,* 627 F.2d

886, 890 (9th Cir.1980) (citation and quotation omitted).

■ There was ample evidence to support O'Connell's conviction for conspiracy. According to Joler, Hart identified O'Connell as "Paully," his cocaine source. A jury could have concluded from Hart and O'Connell's conversation at the construction site that they were negotiating a purchase of cocaine rather than the purchase of a toolbox. O'Connell was seen placing a phone call just as Hart received a phone call from his source. O'Connell was seen driving by Hart's apartment that evening, but was alarmed by the surveillance officers and left. A government agent later saw O'Connell meet with Hart at a highway intersection, after which Hart and O'Connell left in opposite directions and Hart returned to Joler with cocaine. A rational trier of fact could have concluded beyond a reasonable doubt that O'Connell conspired with Hart to distribute cocaine, and could have done so without concluding that O'Connell did every one of these acts.

### C. *O'Connell's Other Claims of Error*

O'Connell seeks to argue that the district court erred by instructing the jury that Hart could not be found guilty of conspiring with an unknown source. O'Connell also claims that the government committed misconduct when it erroneously identified a DEA agent in the transcript of a tape-recorded conversation. O'Connell may not raise these issues in his role as an appellee. O'Connell has no basis for a cross-appeal because no judgment has been entered against him. *Midland Asphalt Corp. v. United States,* 489 U.S. 794, 798, 109 S.Ct. 1494, 1497, 103 L.Ed.2d 879 (1989) (no appellate review until after conviction and imposition of sentence). *See United States v. Cardenas,* 748 F.2d 1015, 1023 (5th Cir. 1984) (when the government appeals a judgment of acquittal, the defendant is in the role solely of an appellee and is only allowed to respond to the government's arguments). *See also United States v. Becker,* 929 F.2d 442, 447 (9th Cir.) (defendant may not file a cross appeal to a section 3731 interlocutory appeal), *cert. de-*

*nied,* —— U.S. ——, 112 S.Ct. 183, 116 L.Ed.2d 145 (1991).

It is true that we can affirm the district court's judgment "on a basis other than that invoked by the district court." *United States v. Telink, Inc.,* 910 F.2d 598, 600 n. 1 (9th Cir.1990). O'Connell has not shown, however, that even were we to rule favorably on his claims of erroneous jury instructions and prosecutorial misconduct, he would be entitled to acquittal rather than reversal of the jury's verdict. *See United States v. Marchini,* 797 F.2d 759, 767 (9th Cir.1986) (if jury instruction constitutes plain error defendant is entitled to reversal of jury verdict), *cert. denied,* 479 U.S. 1085, 107 S.Ct. 1288, 94 L.Ed.2d 145 (1987). Thus, there is no basis other than the inconsistency issue on which to support his acquittal, and his conviction must stand at this time.

### D. *Hart's Motion for Acquittal*

In order to convict Hart of conspiracy the government had to prove that at least two persons were involved in the conspiracy. *United States v. Becker,* 720 F.2d 1033, 1035 (9th Cir.1983). The district court ruled that because the evidence and instructions required that Hart be found to have conspired with O'Connell if at all, once O'Connell's conviction fell so, too, did Hart's. We need not consider whether that is accurate because, as we have shown, O'Connell's conviction must stand. In light of O'Connell's conviction, the evidence to convict Hart of conspiracy was ample. Thus, the district court's order of acquittal of Hart must be reversed.

The district court's grant of Hart's motion for a new trial was also premised on the assumption that O'Connell had been acquitted. That ruling must, therefore, fall along with the others.

### E. *Hart's Entrapment Defense*

Hart argued to the jury that he was entrapped into selling cocaine to Joler, but the jury rejected this defense. "[W]e will

not disturb the jury's finding unless, viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that [Hart] was predisposed to commit the charged offenses." *United States v. Stenberg,* 803 F.2d 422, 432 (9th Cir.1986) (citation omitted).

■ Hart has failed to point to "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by trickery, persuasion, or fraud of a government agent." *Smith,* 802 F.2d at 1124 (citation omitted). Joler testified that Hart readily admitted he was "in the [cocaine] business" and agreed to obtain cocaine for Joler without being pressured to do so. The jury could have concluded from this evidence of prompt acquiescence that Hart was "predisposed to violate the law *before* the Government intervened." *Jacobson v. United States,* —— U.S. ——, —— n. 2, 112 S.Ct. 1535, 1540 n. 2, 118 L.Ed.2d 147 (1992).[1] *Cf. Sherman v. United States,* 356 U.S. 369, 375, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958) (Government failed to offer evidence in support of its claim that the petitioner was predisposed to commit the crime). In *Jacobson,* the Court held that the defendant's predisposition to purchase child pornography was in fact the product of more than two years of government attention, including promotional material from five fictitious organizations and letters from a bogus pen pal. *Jacobson,* —— U.S. at ——, 112 S.Ct. at 1542. The government did not direct that kind of attention at Hart in order to make him receptive to the idea of distributing cocaine. Evidently it did not need to. According to Joler, when he proposed that Hart distribute cocaine, Hart readily agreed. The jury was entitled to believe Joler rather than Hart and apparently did. We cannot say its decision was unreasonable.

### F. *Hart's Claim of Outrageous Government Conduct*

■ Hart's contention that the activities of informant Joler were so outrageous

---

1. We note that the jury was instructed to consider Hart's disposition "before encountering the law enforcement officers or their agents." The

district court's instruction on entrapment was substantially similar to the instruction approved

as to deprive him of due process is without merit. In order to violate due process, "governmental conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice.'" *United States v. Barrera–Moreno*, 951 F.2d 1089, 1092 (9th Cir.1991) (citation omitted). We review *de novo* the dismissal of an indictment on due process grounds, while we review the factual findings underlying the dismissal under the clearly erroneous standard. *Id.* at 1091. The activities of informant Joler do not rise to the level of a due process violation. According to Hart, Joler befriended him during a period of emotional turmoil and posed as his friend. Joler asked Hart to purchase cocaine for him and Hart claims that he acceded to these requests out of friendship and sympathy. Even if we accepted this characterization of the evidence, we rejected similar claims of outrageous conduct in *United States v. Smith*, 924 F.2d 889, 897 (9th Cir.1991).[2]

## CONCLUSION

The jury determined that Hart and O'Connell conspired to sell cocaine. It also determined that Hart made a number of sales but that O'Connell did not make any. The evidence supports the convictions. On the other hand, the jury was not impressed with Hart's claim that he had been entrapped, and the district court did not find outrageous government conduct. We cannot say that the evidence compels different conclusions.

Therefore, we reverse the district court's granting of the motions of O'Connell and Hart for acquittal and also reverse the grant of a new trial to Hart.

REVERSED in part, AFFIRMED IN PART, and REMANDED for further proceedings.

---

by the Court in *Jacobson,* —— U.S. at —— n. 1, 112 S.Ct. at 1540 n. 1.

**2.** While Hart relies on *United States v. Luttrell,* 889 F.2d 806, 813 (9th Cir.1989) for the proposition that police officers must have "reasoned grounds" to approach apparently innocent persons and offer them the opportunity to commit

a crime, that portion of *Luttrell* has since been overruled. *United States v. Luttrell,* 923 F.2d 764 (9th Cir.1991) (en banc), *cert. denied,* —— U.S. ——, 112 S.Ct. 1558, 118 L.Ed.2d 207 (1992).