**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Jennifer E. SKARIE, Defendant–
Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Jennifer E. SKARIE, Defendant–
Appellant.**

**Nos. 91–50007, 91–50220.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 10, 1991.

Submitted July 20, 1992 *.

Decided July 28, 1992.

---

* The panel unanimously finds case number 91–50220 suitable for submission without oral argu-   ment pursuant to 9th Cir.R. 34–4.

Sara A. Rapport, Federal Defenders of San Diego, San Diego, Cal., for defendant-appellant.

Peter C. Lewis, Asst. U.S. Atty., San Diego, Cal., for plaintiff-appellee.

Before: B. FLETCHER, D.W. NELSON, and BRUNETTI, Circuit Judges.

D.W. NELSON, Circuit Judge:

Appellant Jennifer Skarie was convicted of possession of approximately three pounds of methamphetamine with intent to distribute and conspiracy to possess methamphetamine. She was sentenced to prison for ten years without possibility of parole. Skarie challenges her conviction on the grounds that evidence was improperly admitted, that she was entitled to acquittal as a matter of law because she was entrapped, and that the jury instructions given were improper. Because we find that Skarie was entrapped as a matter of law, we reverse her conviction.

## FACTS

Jennifer Skarie lived on an isolated ranch with her three sons and several women she had taken in and cared for. She lived with her husband, Duane Skarie, until the fall of 1988. Her husband repeatedly threatened and abused her, and she had him arrested four times for spousal abuse. After the last arrest, the local sheriff told Jennifer Skarie to "quit harassing" the sheriff's department and that they could not "babysit" her anymore. Skarie forced her husband out of the house in late 1988, although he returned periodically thereafter.

In the fall of 1988, a distant relative of Duane Skarie named John Byrd but known as "Little Bear" (hereinafter "Bear") moved into Jennifer Skarie's house. Bear was at all relevant times a paid government informant. After Bear moved in with Skarie, he began to make sexual advances towards her and towards the women living with her. Bear was a violent person who threatened people regularly and was usually armed, even in the house.

In January 1989, Skarie forced Bear out of her house because Bear had been using methamphetamines in the house, had en-

couraged the women living there (some of whom were recovering drug addicts) to use drugs, and had physically threatened her son. Bear reacted violently to being thrown out, and made a variety of threats against Jennifer Skarie.

In February 1989, Bear asked Skarie to put him in touch with some people who could sell him drugs. Skarie demurred.[1] Bear continued to pressure her to introduce him to people she knew who sold drugs; he would call as often as ten times a day and would often come by Skarie's house uninvited. Bear also made a variety of threats to Skarie and other members of the household. He impaled one of her chickens on a stick and left it outside her back door; he later stated that what had happened to the chicken could happen to people as well. He told Skarie that it would be easy to slit the throats of her horses, and threatened to kidnap her six-year old son "so that you will never see him again."

Skarie finally agreed to meet with Bear's friend (actually Narcotics Task Force Agent Buttitta) who said he was interested in buying ten pounds of methamphetamine. At this initial meeting, Buttitta showed her $70,000 in cash. The extent of Skarie's participation in this and several subsequent meetings leading up to the sale of approximately three pounds of methamphetamine is disputed. Skarie did not show up at the next meeting set up by Bear, but did show up thereafter on several occasions. She also took Bear to meet McDonald, a friend of Skarie's husband who had the methamphetamine for sale and who was initially a co-defendant in this case. On May 13, 1989, Bear took $80 to Skarie's house and returned with small amounts of methamphetamine; the parties dispute whether Skarie sold those amounts to him or whether he had previously concealed the drugs on her 110–acre ranch.

On May 23, 1989, McDonald brought approximately three pounds of methamphetamine in his truck to Skarie's house, where he showed it to Bear and Skarie in the front yard. McDonald and Skarie were promptly arrested, and both their houses were searched. McDonald's house contained additional amounts of methamphetamine; no drugs were found on Skarie's person or in her house.[2]

Skarie was charged with possession of narcotics with intent to distribute (based on the drugs McDonald brought over in his car) and conspiracy to possess narcotics with intent to distribute (based on all the drugs found in McDonald's car and home).[3] She defended on a theory of entrapment, and the jury was instructed on that theory. During its deliberations, the jury questioned the court as follows:

> Question for the Judge: If Ms. Skarie was, by definition, "entrapped" at a given point in the process, can she, at a later point, become "unentrapped" if she, at that later point begins to be pro active in the process?

Over Skarie's objection, the court gave what is called a *"North* instruction" (based on *United States v. North,* 746 F.2d 627, 629–30 (9th Cir.), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985)), which answered the jury's question in the affirmative. Based on this instruction, Skarie was convicted and sentenced to ten years in prison for her role in the scheme.

## DISCUSSION

Skarie raises four issues on appeal. First, she contends that the trial judge improperly admitted several pieces of physical evidence. Second, she claims that she was entitled to acquittal because she was entrapped as a matter of law. Third, she argues that the trial court erred in giving a

1. Skarie had used methamphetamines about three years before, when she lived with her husband, who was a regular drug user. Uncontradicted testimony indicates that she had not used drugs since that time, and that she was very "anti-drug."

2. Chemical analysis of a scale found in Skarie's barn did reveal traces of methamphetamine,

suggesting that drugs had been on the scale in the past. The presence of such traces is consistent either with Bear's story that he purchased drugs from Skarie on May 13, or Skarie's story that Bear had concealed drugs in her barn.

3. McDonald pled guilty and was not involved in Skarie's trial.

*North* instruction to the jury when she was only charged with one substantive offense. Finally, she objects to the trial court's refusal to give a duress instruction once it gave the *North* instruction. We address only the second issue.

Entrapment is designed to prevent the conviction of the "unwary innocent" induced by government action to commit a crime. It does not, however, protect the "unwary criminal." *United States v. Russell,* 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973). A defense of entrapment has two elements: government inducement of the crime and the absence of predisposition on the part of the defendant. To be entitled to acquittal as a matter of law on the basis of entrapment, Skarie must point to "undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act" by government agents. *United States v. Hart,* 963 F.2d 1278, 1283 (9th Cir.1992) (quoting *United States v. Smith,* 802 F.2d 1119, 1124 (9th Cir.1986)). In this case, undisputed evidence indicates that Bear initiated the idea of the methamphetamine sale, pressured Skarie repeatedly to agree to the plan, and threatened her in order to convince her to do so. Government *inducement* of the crime is therefore established as a matter of law.

"Where the Government has induced an individual to break the law and the defense of entrapment is at issue, ... the prosecution must prove beyond reasonable doubt that the defendant was disposed to commit the criminal act prior to first being approached by Government agents." *Jacobson v. United States,* — U.S. —, —, 112 S.Ct. 1535, 1540, 118 L.Ed.2d 147 (1992). Five factors are relevant in determining predisposition: (1) the character of the defendant, (2) who first suggested the criminal activity, (3) whether the defendant engaged in the activity for profit, (4) whether the defendant demonstrated reluctance, and (5) the nature of the government's inducement. *United States v. Citro,* 842 F.2d 1149, 1152 (9th Cir.1988). In reviewing these factors, we "view the evi-

dence in the light most favorable to the government." *Id.* at 1151. Of these five factors, the most important is whether the defendant demonstrated reluctance which was overcome by the government's inducement. *Id.* at 1152.

With regard to the first factor, Skarie's character, several uncontradicted witnesses testified to Skarie's present anti-drug stance, to her throwing Bear out of her house in part because he was using drugs, and to her opening her home to several recovering drug addicts. The only evidence the government presented that Skarie was "predisposed prior to the Government acts intended to create predisposition," *Jacobson,* — U.S. at —, 112 S.Ct. at 1543, was the fact that she admitted having used methamphetamines in the past, and Bear's testimony that he had sold an unknown quantity of drugs for her to an unknown third party at some undefined point in the past. The Supreme Court has held such prior acts are insufficient to create a jury question regarding predisposition:

> The Government's additional evidence in the second trial to show that petitioner was ready and willing to sell narcotics should the opportunity present itself was petitioner's record of two past narcotics convictions. In 1942 petitioner was convicted of illegally selling narcotics; in 1946 he was convicted of illegally possessing them. However, a nine-year-old sales conviction and a five-year-old possession conviction are insufficient to prove petitioner had a readiness to sell narcotics at the time Kalchinian approached him, particularly when ... he was trying to overcome the narcotics habit at the time.

*Sherman v. United States,* 356 U.S. 369, 375–76, 78 S.Ct. 819, 822, 2 L.Ed.2d 848 (1958). In *Sherman,* a *conviction* for selling drugs was insufficient to demonstrate predisposition; Sherman was entitled to acquittal as a matter of law on the entrapment theory. *Id.* at 370, 378, 78 S.Ct. at 820, 823. Given that, we do not believe that the disputed testimony of Bear regard-

ing prior drug sales, standing alone, is sufficient to prove predisposition.[4]

The second factor, the origins of the criminal scheme, and the fifth factor, the nature and timing of the government inducement, cut strongly in Skarie's favor. The government concedes that Bear initiated the idea of a drug transaction and repeated it several times. Skarie refused to participate for over two months in the face of repeated requests by the government, and relented only after the government's agent made a number of graphic and violent threats against her and her family. Skarie's testimony that she was induced in part by Bear's threats was not contested at trial.

The third factor, the profit motive, is the only one which may favor the government. Agent Buttitta testified that Skarie told him on several occasions that the price of the methamphetamine had risen, and that she said they could make good money from the deal. From his testimony, it is not entirely clear whether Skarie raised the price of her own accord or whether Agent Buttitta in fact suggested it to her.

The fourth factor, the extent of Skarie's reluctance, was the focus of the trial. Skarie presented evidence of Bear's repeated threats and his abusive manner. She also presented evidence that she initially refused to cooperate with Bear, and that he pressured and threatened her repeatedly before she finally agreed to the scheme. These facts are not disputed by any government witness. Bear acknowledged that he had to "talk to" Skarie "two or three times" before she agreed to meet Agent Buttitta. The government's only evidence of Skarie's willing participation in the sale was the testimony of Agent Buttitta, who stated that Skarie never showed any fear of Bear and appeared calm throughout their series of meetings. Buttitta also testified to Skarie's active participation in the scheme and that she at times initiated contact, an allegation Skarie denies.

All this evidence of "predisposition"— Buttitta's testimony regarding Skarie's active and allegedly willing participation, and Skarie's supposed profit motive—was developed between March and May of 1989, long after Bear initiated contact with Skarie.[5] Where evidence of "predisposition" comes only after the government has devoted considerable time and effort to persuading the defendant, "[r]ational jurors could not say beyond a reasonable doubt that petitioner possessed the requisite predisposition prior to the Government's investigation and that it existed independent of the Government's many and varied approaches to petitioner." *Jacobson*, —— U.S. at ——, 112 S.Ct. at 1543.

We conclude that the government has failed to meet its burden in this case. As *Jacobson* makes clear, predisposition is tested at a time "prior to the Government acts intended to create predisposition." at ——, 112 S.Ct. at 1543. In this case, the government's agent Bear moved in with Skarie in October of 1988 and was abusive and threatening to her and her family between that time and May of 1989. Skarie kicked Bear out of the house in January of 1989 for using drugs, refused on several occasions to sell drugs to Bear, and relented only after Bear threatened her, her children, and her animals, and punctuated those threats by impaling one of her chickens while it was still alive and leaving it outside her door. Even then, the extent of Skarie's participation in the drug sale is open to dispute. At most, Skarie served as a conduit between Buttitta and Bear on the one hand and McDonald on the other.

We conclude as a matter of law that no reasonable jury could find beyond a reasonable doubt that Skarie was predisposed to sell drugs independent of the government's

---

4. Skarie, like Sherman, was attempting to kick a prior drug habit. There is abundant, uncontradicted evidence in the record that Skarie kept herself and her house "drug-free," and that in fact she kicked Bear out of her house for using drugs.

5. Indeed, the government eventually prevailed at trial by relying on a theory that Skarie was initially entrapped, but later became "unentrapped."

actions. Skarie was entrapped, and she is entitled to be acquitted.

## CONCLUSION

Jennifer Skarie's conviction is RE-VERSED and REMANDED with instructions to enter a judgment of acquittal. In light of our disposition of this case, Skarie's motion for bail pending appeal is DE-NIED as moot.

REVERSED and REMANDED.