8 F.3d 31
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Gayle Meshawn BROWN, Defendant-Appellant.
 No. 92-50311.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 12, 1993.
Decided Oct. 8, 1993.
 
 1
 Before: WOOD,* REINHARDT, and RYMER, Circuit Judges
 
 
 2
 MEMORANDUM**
 
 
 3
 Gayle Meshawn Brown appeals her conviction for conspiracy to distribute cocaine and use of a communications facility to facilitate a felony drug offense. We have jurisdiction pursuant to 18 U.S.C. § 3231, and we affirm.
 
 
 4
 * Douglas McNeil and his mother, Rae Ross, were both confidential informants working with the Riverside, California police departments. They lived in the same apartment complex as Brown. McNeil met Brown when he asked her to buy him some beer, as he was not old enough to do it himself. A few months later, McNeil asked Brown if she could get him some "speed" (methamphetamine). Brown said that she knew someone who could, and, using McNeil's phone, paged a supplier. Later that day, Brown, McNeil and the supplier met, and McNeil and the supplier arranged a transaction for the following day.
 
 
 5
 According to Ross, while Brown was arranging the speed transaction, Brown mentioned that she was planning a trip to Los Angeles to obtain some cocaine from her cocaine supplier, who was "very well connected." Brown frequently visited Ross's apartment and on one visit, mentioned that her uncle imported heroin from Thailand. During that visit, Brown showed Ross the cocaine that she had earlier obtained from her trip to Los Angeles. Brown bragged to Ross about the people she knew in the drug business and how she fit into that life style.
 
 
 6
 Ross then told Brown that she had a buyer interested in buying five kilograms of cocaine and possibly some China white heroin. Ross asked Brown if she could find a supplier. Brown called Janine Rambo, her cocaine supplier, and relayed to Ross that Rambo would charge $75,000 for five kilograms. Ross then told Brown that she could sell the cocaine for $100,000, and the two agreed to split the $25,000 profit. Ross testified that Brown was "excited" and "more than willing to do the deal."
 
 
 7
 Later that day, Brown brought Ross a sample of China white heroin which Brown had in her apartment. Ross purchased the sample for $30, and turned it over to the Riverside Police Department. A few days later, Brown brought Ross another sample of heroin, and asked if her buyer would be interested in it. Ross contacted Detective Gary Crawford of the Riverside Police Department, who posed as Ross's alleged buyer, and the three arranged a meeting. According to Ross, Brown was excited about this meeting, and was never pressured to arrange the sale. At the meeting, Brown sold Crawford a small amount of China white heroin for $10. The heroin was later analyzed by police and found to be 100% pure.
 
 
 8
 Soon thereafter Brown arranged for another sale to Detective Crawford. This time, Ross told Brown that Crawford was interested in a one-ounce sample of cocaine, in order to decide whether to purchase five kilograms. Brown purchased an ounce of cocaine from her supplier, Rambo, and gave it to Ross to give to Crawford. Ross testified that Brown was not very excited about this transaction because it would only bring her $100, and that she was more excited about the potential five kilogram transaction because it would enable her to "get a car, her own place and the things she wanted."
 
 
 9
 After the sample was sold, Brown, Ross, and Detective Crawford arranged for a five kilogram purchase. Though it was originally planned that Rambo would sell Brown the cocaine for $75,000, Rambo increased the price to $82,000. Ross testified that Brown was upset at this new price since it represented a smaller profit. Later that day, Brown, from her mother's house in Los Angeles, spoke with Ross and Rambo on a three-way phone call and confirmed that the transaction would take place the next day. This call, which was overheard by Detective Crawford and Robert Meier, another detective with the Riverside Police Department, was recorded and replayed to the jury at trial.
 
 
 10
 The next day, as planned, Brown and Ross drove to Rambo's house to pick up the five kilograms of cocaine. Brown was very excited about the deal, and was frustrated by the heavy traffic which was slowing them down. According to Ross, Brown said in reference to the traffic, "Don't these people know we're on a mission?" Ross also said that Brown snorted some cocaine on the way to Rambo's house.
 
 
 11
 Before arriving at Rambo's house, Brown and Ross met with Detective Crawford who was still posing as a buyer. They had a conversation, which was recorded, about how the transaction would take place and whether it would be for the full five kilograms. Brown confirmed that the transaction would be for five kilograms, and then left for Rambo's house. When Brown and Ross finally arrived at Rambo's house, they both went in and met with Rambo. After a few minutes, Brown went outside and acted as a lookout.
 
 
 12
 The police had planned for Ross to walk into the house, verify that there was cocaine inside, then leave the house and give a signal for the police to begin the arrest. This plan went awry, however, when Brown spotted the police van parked down the street from Rambo's house. According to Detective Crawford, Brown had seen the van, walked up to it from Rambo's house, and looked inside. Detective Crawford, who like the other arresting officers in the van was dressed in his "RAID gear" which clearly identified him as a police officer, tried to hide in the back of the van so that Brown would not see him. He apparently was unsuccessful, because Brown turned away from the van and began walking quickly towards Rambo's house.
 
 
 13
 The police then dropped the original plan and began the arrest. As the police surrounded Brown, she began yelling "Police." The police arrested Brown and Rambo, and found over 29 kilograms of cocaine, a small quantity of tar heroin, drug paraphernalia, and a loaded weapon in Rambo's house. The police also found a small amount of cocaine in Brown's purse. After her arrest, Brown told police that she was involved in the drug transaction solely for the money, and that she was expecting to be signed to a recording contract in the near future. She did not say that she was coerced or threatened to participate in this or the other transactions. According to Ross, she never threatened or coerced Brown into participating in any of the transactions, including the last one.
 
 
 14
 At trial, Brown raised an entrapment defense, and told a very different story from that of the witnesses for the government. Brown testified that Ross had repeatedly asked her to set up each of the drug transactions, even though Brown refused her many requests. Finally, Brown gave Ross (free of charge) a little bit of heroin (the $30 transaction) that she had stashed away from a long time ago. Brown testified that after giving her this small amount of heroin, Ross again repeatedly asked Brown (up to seven times a day) to arrange for a cocaine transaction.[1] Each time, Brown claims, she told Ross she could not come up with any cocaine. Finally, after repeated inquiries, Brown called Rambo and arranged for Rambo and Ross to talk. According to Brown, she was not as involved in the subsequent sample transactions as Crawford and Ross claimed she was.
 
 
 15
 Brown also testified that the five kilogram purchase was essentially between Ross and Rambo. In fact, according to Brown, she thought the three-way phone call concerned a transaction for one ounce. Rambo was to bring the cocaine to Ross, but Ross later told Brown that Rambo couldn't come and instead that Ross had to pick up the cocaine. Ross insisted that Brown accompany her to Rambo's house. Brown claimed to be very reluctant and scared, but after repeated requests agreed to go. According to Brown, it wasn't until they were already on the road that Ross told Brown that she was picking up five kilograms of cocaine from Rambo's house. Brown said she was very scared and reluctant to accompany Ross to the house for the transaction.
 
 
 16
 Brown admitted that prior to meeting Ross, she had used cocaine. However, she testified that she had never participated in selling drugs prior to her involvement with Ross. Several other witnesses testified on Brown's behalf, including her mother, her sister, her manager, and her preacher.
 
 
 17
 After the case was sent to the jury, the court received a note from the foreperson indicating that at least three jurors were uncomfortable with and perhaps intimidated by some of the spectators in the courtroom. Brown moved for a mistrial arguing that the note indicated that the jury was prejudiced against her. The court denied the mistrial. Brown was later convicted, and she now appeals.
 
 II
 
 18
 Brown first argues that the district court erred in failing to grant her motion for an acquittal since she was entrapped as a matter of law. Entrapment has two elements: government inducement of a crime and the absence of predisposition on the part of the defendant. United States v. Skarie, 971 F.2d 317, 320 (9th Cir.1992). To be entitled to an acquittal as a matter of law, Brown must point to undisputed evidence making it patently clear that an otherwise innocent person was induced to commit the illegal act by government agents. Id.
 
 
 19
 Brown argues that the government failed to prove predisposition. We will not disturb the jury's finding unless "viewing the evidence in the light most favorable to the government, no reasonable jury could have concluded that [Brown] was predisposed to commit the charged offense." United States v. Hart, 963 F.2d 1278, 1283 (9th Cir.1992). There are five factors to be considered in determining predisposition: (1) the defendant's character, (2) who first suggested the criminal activity, (3) whether the defendant engaged in the activity for profit, (4) whether the defendant demonstrated reluctance, and (5) the nature of the government's inducement. Skarie, 971 F.2d at 320. In viewing these factors, we consider the evidence in the light most favorable to the government. Id. Of the five factors, whether the defendant demonstrated reluctance which was overcome by government inducement is the most important. Id.
 
 
 20
 Brown argues that the government failed to prove predisposition because there was insufficient evidence about Brown's conduct prior to coming in contact with Ross to show that Brown was predisposed to commit the crime. We disagree. Though predisposition is tested at a time prior to government acts intended to create predisposition, see id. at 321 (citing Jacobson v. United States, 112 S.Ct. 1535, 1543 (1992)), predisposition may be manifested by evidence occurring after government contact with the defendant. In Jacobson, the Supreme Court looked to both the defendant's pre-investigation and post-investigation conduct to determine predisposition. 112 S.Ct. at 1541-42; see also id. at 1541 (ready commission of criminal act amply demonstrates predisposition). Viewing the evidence in the light most favorable to the government, there was ample evidence to support the conviction: Brown bragged about her connections in the drug business; she freely and without coercion participated in a methamphetamine transaction with McNeil, a heroin transaction with Ross, another heroin transaction with Ross and Crawford, an ounce cocaine transaction with Ross, Rambo, and Crawford, and a five kilogram cocaine transaction with Ross, Rambo, and Crawford; she eagerly anticipated the revenue from the transactions; she referred to kilograms of cocaine in tape-recorded conversations as "keys," suggesting familiarity with slang involved in drug transactions; and she was recorded twice while arranging drug transactions.
 
 
 21
 Brown's further argument, that the government went to a lot of effort to implant her with the requisite predisposition as it impermissibly did in Skarie and Jacobson, boils down to a contention that her version is more accurate than the government's. This, however, was for the jury to decide since there was evidence supporting both versions. See Hart, 963 F.2d at 1283 (jury was entitled to believe government informant instead of defendant). Unlike Skarie, the evidence of government pressure and the defendant's reluctance is not undisputed. Skarie, 971 F.2d at 320 (threats and reluctance undisputed); see also Hart, 963 F.2d at 1283 (evidence of entrapment must be undisputed). Nor is Jacobson compelling, as the defendant's predisposition to purchase child pornography in that case resulted from the government's persistence, over two and a half years, to induce him to buy pornographic pictures. 112 S.Ct. at 1541-43. Nothing comparable occurred in this case.
 
 III
 
 22
 Next Brown argues that the court erred in denying her motion for a mistrial. Denial of a motion for a mistrial is reviewed for abuse of discretion. United States v. Charmley, 764 F.2d 675, 677 (9th Cir.1985). However, this court reviews alleged jury misconduct independently in the context of the entire record. United States v. Madrid, 842 F.2d 1090, 1092 (9th Cir.), cert. denied, 488 U.S. 912 (1988). To merit reversal, Brown must demonstrate actual prejudice resulting from an ex parte contact with a juror. Id. at 1093 (relying on Smith v. Phillips, 455 U.S. 209, 216-17 (1982) and Rushen v. Spain, 464 U.S. 114, 118-21 (1983) (per curiam)).
 
 
 23
 The record shows neither juror misconduct nor actual contact or communication with spectators in the courtroom or elsewhere. Brown argues that there was indirect nonverbal communication from the spectators to the jurors which compromised the jury's decision, and that the district court should have determined whether Brown was prejudiced under Remmer v. United States, 347 U.S. 227 (1954). Whether or not "indirect" contact occurred, Brown failed to establish that whatever communication there may have been actually prejudiced her. Accordingly, the juror's discomfort affords no basis for reversal. Smith, 455 U.S. at 216-17; Madrid, 842 F.2d at 1093.[2]
 
 IV
 
 24
 Brown next argues that the court erred in excluding, as irrelevant, evidence about the details of her pending recording contract. Determinations of relevancy are within the broad discretion of the trial court. United States v. Feldman, 788 F.2d 544, 557 (9th Cir.1986), cert. denied 479 U.S. 1067 (1987). Brown argues that record contract evidence was relevant to her lack of a profit motive in the drug transactions and would have buttressed her defense of entrapment.
 
 
 25
 The proffered evidence, however, concerned a potential deal, making it only of speculative worth to Brown's financial condition. Excluding the additional testimony was therefore within the court's discretion.
 
 V
 
 26
 Brown argues that the district court erred in twice instructing the jury:
 
 
 27
 The defense of entrapment is unavailable to a defendant who, motivated by greed, accepts an opportunity to commit an offense.
 
 
 28
 Since Brown failed to object, our review is for plain error. United States v. Anguiano, 873 F.2d 1314, 1319 (9th Cir.), cert. denied, 493 U.S. 969 (1989). We hold that, in this circumstance, the instructions did not amount to plain error.
 
 
 29
 "Plain error is highly prejudicial error affecting substantial rights, and is found only in exceptional circumstances." United States v. Williams, 990 F.2d 507, 511 (9th Cir.1993) (citation omitted). "Reversal of a criminal conviction on the basis of plain error is an exceptional remedy, which we invoke only when it appears necessary to prevent a miscarriage of justice or to preserve the integrity and reputation of the judicial process." Id. at 512 (citation omitted). As the Supreme Court has stated, a plain error should be corrected if it results in the conviction of an actually innocent defendant or if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings independent of the defendant's innocence." United States v. Olano, 113 S.Ct. 1770, 1779 (1993) (internal quotation marks omitted). "Rarely will an improper jury instruction justify a finding of plain error." Williams, 990 F.2d at 512 (citation omitted). "In applying the plain error standard we consider all circumstances at trial including the strength of the evidence against the defendant." Id. (citation omitted).
 
 
 30
 Very few cases have found plain error arising from faulty jury instructions. In United States v. Vowiell, 869 F.2d 1264 (9th Cir.1989), we found plain error where the district court's instructions permitted the jury to find the defendant guilty of a crime for which the defendant had not been charged. Id. at 1271. In United States v. Gilley, 836 F.2d 1206 (9th Cir.1988), there was plain error because the district court's instruction allowed the jury to convict "without unanimously agreeing to the facts forming its basis" for the verdict. Id. at 1212. Failure to give an adequate instruction on mens rea also has been found to be plain error, United States v. Aguon, 851 F.2d 1158, 1167-68 (9th Cir.1988) (en banc), overruled on other grounds, Evans v. United States, 112 S.Ct. 1881, 1884 (1992); see also United States v. Kostoff, 585 F.2d 378, 379-80 (9th Cir.1978) (failure to instruct on mail fraud in a conspiracy to commit mail fraud case was plain error).
 
 
 31
 Here, the challenged instruction overemphasized greed as one of the factors of entrapment. Greed is only one of five factors to be considered when determining whether a defendant was entrapped. Skarie, 971 F.2d at 320. Nevertheless, instructing as the district court did does not amount to plain error. Although the instruction could have been written more clearly and we do not embrace the way the entrapment instructions were crafted, the rest of the instructions (apart from twice mentioning the factor of greed) adequately summarized the law on entrapment. They accurately listed the five factors discussed in Skarie and properly noted that reluctance was the most important. Any error was of a much smaller magnitude that the plain error found in Vowiell, Aguon, Gilly, and Kostoff. In each of those cases, the instructions failed properly to articulate a fundamental requirement for a conviction, such as mens rea, or allowed the jury to convict for a crime which was not charged or defined. Here, the instruction was not so fundamentally flawed as to seriously affect the fairness, integrity, or public reputation of judicial proceedings.
 
 
 32
 Moreover, there was ample evidence, including the testimony of Detective Crawford that Brown sold him heroin and the tape recordings of Brown arranging two transactions, to assure us that there was no miscarriage of justice. There was evidence that Brown freely engaged in speed, heroin and cocaine deals prior to being arrested, and was eagerly anticipating the profit from the five kilogram transaction. When considered in light of the evidence against Brown, the challenged instruction was not so erroneous as to constitute a miscarriage of justice.
 
 VI
 
 33
 Brown also argues that the district court erred in calculating her sentence based on a drug quantity of five kilograms. We review a district court's factual findings regarding sentencing for clear error. United States v. Torres-Rodriguez, 930 F.2d 1375, 1389 (9th Cir.1991).
 
 
 34
 According to Brown, the evidence only shows that the transaction was for "four or five" kilograms, not five kilograms. Even so, the district court's finding was not clearly erroneous since there was ample evidence that the transaction was for five kilograms.
 
 VII
 
 35
 Finally, Brown argues that the court erred in not allowing her to recall Ross for more cross-examination. We review for abuse of discretion. Id. at 1384. Nothing in the record indicates that Brown requested additional cross-examination, although she indicates that is because the request occurred at side bar off the record. In any event, if such a request were made, it was not an abuse of discretion to deny it, as cross-examination of Ross was thorough.
 
 
 36
 AFFIRMED.
 
 REINHARDT, Judge, dissenting:
 
 37
 The majority and I are apparently in agreement that the trial court erred in instructing the jury that the entrapment defense "is unavailable to a defendant, who motivated by greed, accepts an opportunity to commit an offense."[1] See Majority Disposition, supra Part V, at 11-13. Nevertheless, it holds that the error did not constitute plain error. See id. at 13. Accordingly, it refuses to grant Gayle Meshawn Brown a new trial. Because I believe that the erroneous instruction did constitute plain error, I dissent.
 
 
 38
 Preliminarily, I should note that the facts as stated in the first four pages of the majority disposition are those that the majority assumes the jury found because it convicted the defendant. The "facts," however, simply report the testimony of the confidential informants. The issue in this case is whether, in light of the court's erroneous entrapment instructions, the verdict really means that the jury accepted that testimony. Under the instructions given by the court, the jury could well have disbelieved almost all of that testimony and still convicted the defendant. It hardly seems fair, therefore, for purposes of this disposition to treat those allegations as the truth.
 
 
 39
 * * *
 
 
 40
 Last Term, the Supreme Court held that the proper standard for plain error was whether an error would result in a "miscarriage of justice" or whether an error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." United States v. Olano, 113 S.Ct. 1770, 1779 (1993) (internal quotes omitted). I believe that the trial court's error "seriously affected" the fairness of Brown's judicial proceedings because the erroneous instruction countermanded the rest of the entrapment instructions and stripped her of the defense to which she was entitled. Accordingly, I believe that Brown is entitled to a new trial.
 
 
 41
 The trial court told the jury that the defense of entrapment "is unavailable to a defendant, who motivated by greed, accepts an opportunity to commit an offense." Put differently, the court instructed the jury that it could ignore the traditional five-part test for entrapment if it found that Brown was motivated by the single element of greed. This was clearly wrong. See, e.g., United States v. Citro, 842 F.2d 1149 (9th Cir.) (holding that "[n]one of these factors alone indicates either the presence or absence of predisposition" (emphasis added)), cert. denied, 488 U.S. 866 (1988).
 
 
 42
 The majority downplays the significance of the error by holding that the trial court merely "overemphasized" the greed factor. See Majority Disposition, supra, at 12. Accordingly, it concludes that the trial court's error did not rise to the level of plain error. I respectfully disagree. In my opinion, the erroneous instruction dominated the entrapment instructions and overrode the correct portions. The erroneous instruction appeared twice and was clearly central to the trial court's definition of entrapment. It first appeared at the beginning of the entrapment instructions as the prime example of when entrapment is unavailable to an defendant. See R.T. 3/3/92, at 134; Appendix, infra, at 6. It was then repeated at the conclusion of the court's general discussion of entrapment law. See R.T. 3/3/92, at 136; Appendix, infra, at 7. In both instances, the erroneous instruction was set apart from any mention of the five-factor test. Such a placement would tell the jury that greed is a threshold determination that bars the use of the entrapment defense, even though the defendant might be found entrapped under the five-factor test.
 
 
 43
 Finally, the effect of the trial court's error was magnified by the complexity of the jury instructions and by the evidence of actual jury confusion. The trial court's instructions were particularly convoluted; they flipped back and forth between explaining guilt and innocence at least three times. Compare Ninth Cir. Model Crim. Jury Instructions 6.02 (seven lines for entrapment) with Brown Jury Instructions (106 lines for entrapment; attached hereto as Appendix). During its deliberations, the jury sent out several notes that clearly demonstrated that it did not understand the trial court's instructions. One note asked the court to "explain entrapment." Jury Note No. 6. Another asked the court to define "persuasion" and "inducement." Jury Note No. 4. The judge declined to help, explaining that he could not assist the jury beyond the actual language of the instructions.
 
 
 44
 In my opinion, the jurors were understandably confused by the instructions. The erroneous portion told them that the entrapment defense would be unavailable to Brown if they concluded that she was greedy. Under this directive, a jury would never consider the five-factor test by which guilt or innocence must be determined, except in the rare case in which a seller was motivated by non-economic forces. Brown's case obviously did not qualify under that most unusual standard. Because the law is clearly to the contrary and Brown was entitled to have the jury consider her entrapment defense, the error was plain. The fairness of Brown's trial was "seriously affected." To be more precise, Brown was denied a fair trial.[2]
 
 
 45
 Entrapment is what Brown's trial was all about. She based her case principally upon that defense. She attempted to persuade the jury that she had been unlawfully entrapped into selling drugs by the government's informants and offered evidence to that effect. If the jury believed the evidence she adduced, she was entitled to an acquittal. To tell the jury the contrary--to tell it that even if the defendant carried her burden, she must be convicted unless the jurors also determine that she was not greedy--perverted the law and deprived the defendant of due process.
 
 
 46
 * * *
 
 
 47
 For the above reasons, I dissent.
 
 APPENDIX
 
 48
 Brown Jury Instructions R.T. 3/3/92, at 134-38
 
 
 49
 * * *
 
 
 50
 The defendant asserts that she was a victim of entrapment as to the offenses charged in the indictment.
 
 
 51
 Where a person has no previous intent or purpose to violate the law, but is induced or persuaded by law enforcement officers or their agents to commit a crime, she is a victim of entrapment, and the law as a matter of policy forbids her conviction in such a case.
 
 
 52
 On the other hand, where a person already has the readiness and willingness to break the law, the mere fact that the government agents provide what appears to be a favorable opportunity is not entrapment. For example, when the government suspects that a person is engaged in the illicit sale of narcotics, it is not entrapment for a government agent to pretend to be someone else and to offer, either directly or through an informer or other decoy, to purchase narcotics from the suspected person. The defense of entrapment is unavailable to a defendant who, motivated by greed, accepts an opportunity to commit an offense.
 
 
 53
 If, then, the jury should find beyond a reasonable doubt from the evidence in the case that, before anything at all occurred respecting the alleged offense involved in this case, that the defendant was ready and willing to commit crimes such as those charged in the indictment, whenever the opportunity was afforded, and that government officers or their agents did no more than offer the opportunity, then the jury should find the defendant is not a victim of entrapment.
 
 
 54
 On the other hand, if the evidence in the case should leave you with a reasonable doubt whether the defendant had the previous intent or purpose to commit an offense of the character charged, apart from the inducement or persuasion of some officer or agent of the government, then it is your duty to find her not guilty. The burden is on the government to prove beyond a reasonable doubt the defendant was not entrapped.
 
 
 55
 A person is entrapped when the person has no previous intent--intention to violate the law and is persuaded to commit a crime by government agents.
 
 
 56
 On the other hand, where a person is already willing to commit a crime, it is not entrapment if government agents induce her, or provide her with an opportunity, to commit the crime. The fact that the government made the initial contact with the defendant, and not vice versa, does not by itself show entrapment. A reluctance to commit a crime based on fear of being caught does not constitute a lack of previous intention to violate the law. Although whether the defendant has engaged in prior or similar violations of the law is relevant to deciding whether the defendant is predisposed to commit the charged crime, the government is not required to show that the defendant has engaged in prior similar violations of the law to show predisposition to commit the crime charged. A person may be willing to commit his first crime as much as, if not more than, a chronic offender, who theoretically, should be more fearful of the consequences. Finally, the defense of entrapment is unavailable to a defendant who, motivated by greed, accepts an opportunity to commit a crime.
 
 
 57
 The defense of entrapment is not available if the defendant was predisposed to sell the cocaine base. In determining whether the defendant was predisposed, you may consider:
 
 
 58
 (1) The defendant's character or reputation;
 
 
 59
 (2) Whether the defendant or the government originally suggested the criminal activity;
 
 
 60
 (3) Whether the defendant sold cocaine for profit;
 
 
 61
 (4) Whether the defendant was reluctant to sell the cocaine and whether the defendant's reluctance was overcome by repeated government inducement or persuasion; and
 
 
 62
 (5) The nature of the inducement or persuasion provided by the government.
 
 
 63
 Of these factors, whether the defendant was reluctant to engage in the criminal activity is the most important.
 
 
 64
 You may find that the defendant was entrapped in the first instance and therefore all criminal acts following were the subject of the initial entrapment;
 
 
 65
 Or you may find that there was no entrapment and therefore non of the acts are subject to the defense of entrapment;
 
 
 66
 Or you may find that there was entrapment as to some of the acts, but no entrapment as to the other of the acts.
 
 
 67
 These are questions of fact for you to decide.
 
 
 68
 In order to prove that the defendant was not entrapped, the government must prove beyond a reasonable doubt that the defendant was not induced to commit the crimes charged. In that regard, the government must prove beyond a reasonable doubt that the defendant was ready and willing to commit the crimes charged whenever an opportunity was afforded.
 
 
 69
 The defendant is charged in count two of the indictment with illegal use of a communication facility to facilitate a drug felony offense, in violation of law. In order for the defendant to be found guilty of that charge, the government must prove beyond a reasonable doubt that the defendant used a telephone to help bring about the distribution of cocaine, and that the defendant was not entrapped.
 
 
 70
 In order for a defendant to be entrapped, the inducement must come from a government agent. A confidential informant employed by the government, whether or not an independent contractor, is considered to be a government agent. Thus, if you find that the defendant in this case was entrapped by the confidential informant, you must find the defendant not guilty.
 
 
 71
 * * *
 
 
 
 *
 Honorable Harlington Wood, Jr., Senior United States Circuit Judge, Seventh Circuit Court of Appeals, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Phone records indicated several calls from Ross's house to Brown's mother's house. Brown claimed that these calls were made by Ross to harass Brown into arranging a transaction. Ross claims that she was not sure who made the calls, but that it could have been Brown who made them, because Brown did not have a phone of her own and frequently used Ross's phone
 
 
 [2]
 In Remmer an unnamed person offered the jury money to bring back a favorable verdict. The district court notified the FBI, but not the defendant. The Supreme Court ordered a hearing on prejudice, and held that prejudice is presumed (but may be rebutted) whenever "any private communication, contact, or tampering, directly or indirectly" occurs with a juror. 347 U.S. at 229
 This case is different from Remmer since the communication, if any, was so indirect that it is arguably not even "contact." Moreover, Brown's reading of Remmer was rejected in Madrid, in which we narrowly construed Remmer because of Smith and Rushen. 842 F.2d at 1093.
 
 
 [1]
 The instructions clearly misquote United States v. Esquer-Gamez, 550 F.2d 1231, 1234 (9th Cir.1977) by omitting critical aspects of it. See id. at 1234 ("The defense of entrapment ... is unavailable to a defendant who, motivated by greed and unconcerned about breaking the law, readily accepts a propitious opportunity to commit an offense.") (omitted language emphasized). The omitted language reflects the central role of reluctance and predisposition in determining whether a defendant was entrapped
 
 
 [2]
 The majority cites several cases as circuit precedent to support its conclusion that the trial court's error was not plain. See Majority Disposition, supra, at 12. None of these cases is on point, however, because all involved situations in which we found plain error. In fact, none of these cases involved errors that were more serious than the error in this case. Accordingly, in my view, the cases support Brown's position, not the majority's. If they involve plain error, as we held they did, so does the case before us